THEODORUS BRON, *ET AL.*, PLAINTIFFS-APPELLANTS, v. HARRY WEINTRAUB, *ET AL.*, DEFENDANTS-RESPONDENTS.

HUDSON TRADING CORPORATION, *ET AL.*, PLAINTIFFS-RESPONDENTS, v. EMILE W. SAULNIER, *ET AL.*, DEFENDANTS-APPELLANTS.

Argued February 4, 1964—Decided April 20, 1964.

*Mr. Robert N. Wilentz* argued the cause for appellants (*Messrs. Wilentz, Goldman & Spitzer,* of counsel; *Messrs. Boyd, Dodd, Keer & Booth,* attorneys).

*Mrs. Sylvia B. Pressler* argued the cause for respondents.

The opinion of the court was delivered by

WEINTRAUB, C. J.    In 1935 the Township of Woodbridge sold certain vacant lands for unpaid taxes and itself was the buyer at the sale.    In 1940 it foreclosed the tax sale certificates in the former Court of Chancery.    That proceeding ran against Danwil Developers, Inc., as owner.    However, in 1929 that company had conveyed to El-Ka Holding Co., Inc., which in turn conveyed to Harry Weintraub in 1931.    Weintraub apparently was the secretary of both corporations.    He died intestate in 1933, survived by two sisters who lived in California.    The searcher did not pick up the conveyances just mentioned and hence the 1940 foreclosure suit ran only against Danwil Developers, Inc., as we have said.

In 1952 Woodbridge conveyed the lands to a developer who erected homes and sold them for $10,000 to $11,000 each.

Ten such parcels are here involved. In 1959 one of the homes was resold and a search in that connection revealed the failure to bar the Weintraub interests. The township was asked to foreclose those interests, and it started a suit to that end. *N. J. S. A.* 54:5–86.1 *et seq.* Judgment was entered fixing November 13, 1959 as the date by which the unknown heirs of Weintraub had to redeem or be barred. At the eleventh hour Hudson Trading Corporation and Frank Altomare redeemed on the basis of deeds obtained from the Weintraub heirs (the deeds ran to Hudson which in turn conveyed a quarter interest to Altomare).

The present actions ensued, the householders seeking to quiet title and Hudson and Altomare demanding possession and mesne profits. Hudson and Altomare conceded the householders were equitably entitled to remove the improvements or to buy the land at its value unaffected by the improvements. The trial court entered a judgment under which the householders would have to pay for the land the sum of $19,555.11, found to be its value as of the time of the deeds to Hudson and Altomare, plus mesne profits of $2,856.91. Hudson had paid the Weintraub heirs but $400. The Appellate Division affirmed and we granted certification. 40 *N. J.* 507 (1963).

The householders urge that Hudson and Altomare be declared constructive trustees and be required to convey title upon payment of the $400 they gave the Weintraub heirs. Alternatively they say the lands should be valued as of a date prior to the date of the deeds to Hudson, and that, whatever date is approved, the lands should be valued without enhancement due to streets, sidewalks, sewers, and curbing. As to the last proposition, it is unclear whether the appraisers had excluded those items in valuing the "unimproved" land.

■ We need consider only the first proposition, that Hudson and Altomare should receive no more than what they paid the Weintraub heirs, since we are satisfied the householders are entitled to prevail upon it.

Here ten homes were purchased in the *bona fide* belief that title was good. The defect in the 1940 foreclosure was discovered in 1959, some 28 years after the original owners of the vacant land had last paid a penny of taxes. The municipality started a second suit to perfect the title, and in that action it was necessary to advertise as against the Weintraub heirs. In that way Hudson learned of an opportunity to make some money out of the predicament of these householders.

Hudson located Weintraub's sisters in California. Exactly when we do not know, but on November 7, only six days before the date fixed for redemption, one Herbert Harvey wrote to them. His letter opened with a statement that it related to "lots in Middlesex County, New Jersey, in which, according to the record, the late Harry Weintraub had an interest." That the interest was ownership in fee was not disclosed. The letter correctly said the property was sold for taxes in 1935 and a foreclosure action was brought in 1940, but added only that the foreclosure action was deemed "possibly defective." It continued that "you might claim an interest" and we are writing to inquire whether you "will furnish a voluntary release of your possible claim" for a "courtesy consideration" of $50 "for the release." It adds that "The required instrument, in the form of a quitclaim deed, is enclosed." We interpolate that trial counsel for Hudson and Altomare placed on the record:

"It is Mr. Harvey's practice to take quit-claim deeds. I say that of all the deeds he gets, 90 percent are quit-claim deeds. He knows by law a quit-claim deed is just as good as any other kind of a deed."

Mr. Harvey was well informed in that regard, *R. S.* 46:5–1 *et seq.*, but we assume, as no doubt he did, that the recipient of his letter would likely think only of some claim to be released to the existing holder of title in fee. Indeed the letter said the deed "will have the effect of releasing any claim which you have or may have in the land therein described." Finally the letter noted that "this instrument will serve its purpose only if it reaches us without delay—actually no later

than November 13, which seems practically return mail." Appreciation was promised for "your cooperation" and the letter closed "With thanks for your courtesy in the matter."

This letter was palpably deceptive. It was deceptive as to the nature of the outstanding interest. It was deceptive as to identity of the parties on whose behalf it was written. In the latter respect, if no more appeared, it would permit an inference that Harvey led the Weintraub heirs to believe he was acting for the householders, and upon such a finding a constructive trust could be imposed in their favor. *Bell v. Smith,* 159 *Fla.* 817, 32 *So. 2d* 829, 175 *A. L. R.* 695 (*Sup. Ct.* 1947), annotated 175 *A. L. R.* 700 (1948). The cause, however, was not tried on the theory of fraud, and since we are told there were further communications with the Weintraub heirs not spread on the record, we should not decide the case on that basis. Nonetheless we refer to the fraudulent nature of this communication as a sample of the kind of thing to be expected if we hold that strangers may exploit these situations.

Let us look at the interests involved and the impact of Hudson's activities upon them.

■ We are dealing with tax titles. Contrary to early hostility to such titles, the policy today is to support them, thereby to aid municipalities in raising revenue. To that end *N. J. S. A.* 54:5–85 provides:

"The provisions of this article shall be liberally construed as remedial legislation to encourage the barring of the right of redemption by actions in the Superior Court to the end that marketable titles may thereby be secured."

■ Everybody knows that taxes must be paid. True, there may be instances in which the individual concerned is unaware of his property interest, but such cases are rare. Usually the owner omits to pay knowing the end result will be a tax sale. It is therefore understandable that the Legislature found it fair to bar the right to redeem by a strict foreclosure, *i. e.,* by a judgment that payment be made by a fixed date, in default

of which the right to redeem shall end, rather than by a sale as in the case of the foreclosure of a mortgage. The point we stress is that, whereas with respect to the initial sale for taxes, the statute intends to attract third parties to the opportunity to acquire the property and provides for public notice to that end, *N. J. S. A.* 54:5–25 and 26, there is no like policy to invite the public to participate with respect to the foreclosure of the right to redeem. In *Mitsch v. Owens*, 82 *N. J. Eq.* 404 (*Ch.* 1913), in holding that an earlier tax statute did not require a foreclosure by sale, Chancellor Walker said (at *p.* 406) :

"In my judgment the law does not intend to make provision that a total stranger may deprive the purchaser at a tax sale of his right to perfect his title, by strict foreclosure, on the one hand, or usurp the owner's right to redeem, by permitting the land to be bought away from him, on the other hand."

Hence the foreclosure process concerns only the holder of the tax sale certificate and the holders of existing interests in the property. Hudson learned of this situation, not because it was the policy of the law to advertise to solicit its interest, but because of the fortuitous circumstance that the foreclosing municipality had not located the Weintraub heirs. If they had been found, they could have been served without the need for publication. *R. R.* 4:4–5. In short, our rules of court called for this public notice solely to reach the holders of existing interests, but Hudson read a communication intended for another and sought to turn that information to its own gain, thereby depriving the householders of a chance to work out their misfortunes with the holders of the outstanding interests upon a basis presumably no more onerous than the basis upon which Hudson acquired those interests.

In attacking the legality of Hudson's activity, the householders appeal to public policy, the ultimate source of justice. Public policy has been described but never quite defined. *Ready v. National State Bank of Newark*, 117 *N. J. L.* 554, 559 (*E. & A.* 1937) ; *Girard Trust Co. v. Schmitz*, 129 *N. J. Eq.* 444, 456–60 (*Ch.* 1941). The Supreme Court of Ohio

said in *Pittsburgh, Cincinnati, Chicago and St. Louis Railway Co. v. Kinney,* 95 *Ohio St.* 64, 68, 115 N. E. 505, 506, *L. R. A.* 1917 D, 641 (1916):

"What is the meaning of 'public policy'? A correct definition, at once concise and comprehensive, of the words 'public policy,' has not yet been formulated by our courts. Indeed, the term is as difficult to define with accuracy as the word 'fraud' or the term 'public welfare.' In substance, it may be said to be the community common sense and common conscience, extended and applied throughout the state to matters of public morals, public health, public safety, public welfare, and the like. It is that general and well-settled public opinion relating to man's plain, palpable duty to his fellow men, having due regard to all the circumstances of each particular relation and situation.

Sometimes such public policy is declared by Constitution; sometimes by statute; sometimes by judicial decision. More often, however, it abides only in the customs and conventions of the people—in their clear consciousness and conviction of what is naturally and inherently just and right between man and man. It regards the primary principles of equity and justice and is sometimes expressed under the title of social and industrial justice, as it is conceived by our body politic. When a course of conduct is cruel or shocking to the average man's conception of justice, such course of conduct must be held to be obviously contrary to public policy, even though such policy has never been so written in the bond, whether it be Constitution, statute, or decree of court. * * *"

Reflecting as it does the common conscience, public policy changes in its demands with the needs and the widely held feelings of the times. *Henningsen v. Bloomfield Motors, Inc.,* 32 *N. J.* 358, 403 (1960). As was said in *Brooks v. Cooper,* 50 *N. J. Eq.* 761, 769 (*E. & A.* 1893):

"It has been declared that public policy is a variable quality, but the principles to be applied have always remained unchanged and unchangeable, and public policy is only variable in so far as the habits, capacities and opportunities of the public have become more varied and complex. The relations of society become from time to time more complex; statutes defining and declaring public and private rights multiply rapidly, and public policy often changes as the laws change, and therefore new applications of old principles are required. *Davies v. Davies,* 36 *Ch. Div.* 364.

Whatever tends to injustice or oppression, restraint of liberty, restraint of legal right; whatever tends to the obstruction of justice, a violation of a statute, or the obstruction or perversion of the administration of the law; whatever tends to interfere with or con-

trol the administration of the law as to executive, legislative or other official action, whenever embodied in and made the subject of a contract, the contract is against public policy and therefore void and not susceptible of enforcement."

Despite the apparent abstractness of the concept of public policy in its restraint upon individual conduct, there is a large measure of guidance and predictability, for as Professor Corbin points out, men of probity and intelligence can greatly reduce the risk "by an unselfish use of conscience and common sense." 6A *Corbin, Contracts* § 1374, *p.* 6 (1962). His discussion is worth repeating (at *p.* 6) :

"There is still another source of 'illegality,' besides statute and judicial decision. That source is the great common background of life from which come both legislation and common law. It is the prevailing practices of the community of people and their notions as to what makes for the general welfare. Bargains are judged by the folkways and mores of the time. A bargain may be illegal because it is contrary to 'Public Policy,' as that is understood by the judges and administrative officers.

A man of business can not escape feelings of uncertainty if the legality of his bargains is to be determined in this fashion. How can these officials know 'public policy,' a matter as to which there is often such violent disagreement? And how can a layman determine what the officials will decide? Here, again, however, we shall advise that a man of probity and intelligence can avoid excessive risk without materially nullifying his enterprise. In most of his transactions the question of legality does not in fact arise. In most of those in which it does arise, the public policies involved have already been declared by statute or judicial decision. In the number remaining, some of which may be very important indeed, he knows that he will be judged by the practices and opinions of his fellow men, practices and opinions in the midst of which he was born and by which his own mind and conscience have been formed and educated. For a man of probity and intelligence, the risk involved in making a decision and acting on it need not be very great. But 'probity' varies in degree, and intelligence may be lacking. Many men have believed that they were unjustly penalized for action wholly consistent with the public welfare. It is true that lack of probity and a minimum of intelligence may be found in the officials who decide as well as in the man who bargains. That is a risk that we can not wholly avoid, even in a democratic society. The best advice that can be given in this small residuum of cases is that risk of illegality can be avoided only by leaning over backwards and deciding against one's own interest. The bold and resolute may fight and win, but they should be prepared to take the medicine if they lose."

With respect to the factual pattern before us, no one disputes the right of the holders of existing interests to convey them to third persons if they wish.[1] What is challenged is the legality of the intrusion into the scene by third persons who seek only to further their own interests rather than the interests already on hand. As we have pointed out, the policy of the statute is to support tax titles, a policy which overall is burdened by the conduct before us. The burden upon individuals situated as are the householders in this case is evident enough. These manifest hurts should not be tolerated unless it can be said that some other legitimate interest or advantage is served. We find none. We see no social value or contribution in the activities of Hudson. On the contrary, decent men must sense only revulsion in this traffic in the misfortunes of others.

We are not aware of any precedent precisely in point, although reference could appropriately be made to the established hostility toward so-called "heir-hunting." See *Carey v. Thieme,* 2 *N. J. Super.* 458, 466 (*Ch. Div.* 1949); Annotation, 171 *A. L. R.* 351 (1947); note, 7 *Vand. L. Rev.* 104 (1953). In any event, public policy is more than a mere summation of its past applications. It has been said that "Its virtue and vigor lies in its flexibility of application, and while reported cases furnish guides they rarely are compelling in precedent." *Fidelity Union Trust Co. v. Reeves,* 96 *N. J. Eq.* 490, 493 (*Ch.* 1924), affirmed o. b. 98 *N. J. Eq.* 412 (*E. & A.* 1925). As Judge Desmond said in *Latham v. Father Divine,* 299 *N. Y.* 22, 27, 85 *N. E. 2d* 168, 170, 111 *A. L. R. 2d* 802 (*Ct. App.* 1949), the applicability of the con-

[1] We note that in some jurisdictions there may not be a sale of an interest in lands adversely held by another. See 10 *Am. Jur., Champerty and Maintenance* § 18, *p.* 563. This rule originated in an English statute which antedated the Revolution and which was held not to be effective in our State. The issue was initially left open in *Den ex dem. Hadley v. Geiger,* 9 *N. J. L.* 225, 234–235 (*Sup. Ct.* 1827), and later resolved, as we have said, in *Schomp v. Schenck,* 40 *N. J. L.* 195, 206 (*Sup. Ct.* 1878). See also *Bouvier v. Baltimore & New York Ry. Co.,* 67 *N. J. L.* 281, 291 (*E. & A.* 1902).

cept of a constructive trust "is limited only by the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them." We have no doubt the common conscience condemns the conduct of Hudson and Altomare as an undue interference with the rights of the householders. Hudson and Altomare having acquired the outstanding title under "circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same." 4 *Pomeroy, Equity Jurisprudence* (*5th ed.* 1941) § 1053, *p.* 119. The householders are equitably entitled to the property upon the payment of the sum of $400 plus simple interest from the date of the payment to the Weintraub heirs.

The judgments are therefore reversed and the matters remanded to the trial court with directions to enter judgments in harmony with this opinion.

*For reversal* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.