87 N.J. Super. 543 (1965)
210 A.2d 109
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, AN ILLINOIS CORPORATION, PLAINTIFF,
v.
LAWRENCE WALL, RALPH P. PHILLIPS, LEROY SIMMONS AND BERTHA WASHINGTON, DEFENDANTS. RALPH P. PHILLIPS, LEROY SIMMONS, AND BERTHA WASHINGTON, PLAINTIFFS,
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, AN ILLINOIS CORPORATION, AND LAWRENCE WALL, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided April 30, 1965.
*547 Mr. Nicholas R. Rapuano for State Farm Mutual Automobile Insurance Company (Messrs. Gelman & Gelman, attorneys).
Mr. Paul B. Thompson for Ralph P. Phillips, Leroy Simmons and Bertha Washington (Messrs. Lamb, Blake, Hutchinson & Dunne, attorneys).
Mr. George van Hartogh for Lawrence Wall (Messrs. Slingland, Bernstein & van Hartogh, attorneys).
KOLOVSKY, A.J.S.C.
In these consolidated actions State Farm Mutual Automobile Insurance Company (State Farm) seeks rescission of a liability and collision insurance policy issued by it to Lawrence Wall covering a 1962 Pontiac sports coupe.
*548 On August 23, 1962, while the policy was in effect, Wall, driving the automobile on Route 23 in Wayne, New Jersey, collided with an automobile being driven by Leroy Simmons in which Bertha Washington and Ralph P. Phillips were passengers. Both cars were badly damaged and Simmons, Washington and Phillips sustained severe injuries.
On January 21, 1963, five months after the accident, State Farm filed a complaint in the Chancery Division against Wall seeking rescission of the policy and the return of payments which it had made to him under the collision and medical payment provisions of the policy. Although the relief sought would have relieved State Farm of liability to Phillips, Simmons and Washington, they were not joined as parties defendant. They are necessary parties. In re Estate of Gardinier, 40 N.J. 261, 265 (1963); Dransfield v. Citizens Casualty Co., 5 N.J. 190 (1950). Subsequent proceedings have remedied that omission.
On May 21, 1963 Phillips, Simmons and Washington, who in March 1963 had instituted a negligence action against Wall, filed a complaint against State Farm for a declaratory judgment that liability insurance coverage was afforded Wall insofar as their claims are concerned. The declaratory judgment action was thereafter consolidated with the action for rescission instituted by State Farm. The pretrial order entered in the consolidated actions accomplished the necessary joinder of Phillips, Simmons and Washington as parties defendant to the action for rescission.
That equity may grant rescission of an insurance policy upon proof of reliance upon material representations untrue in fact, without proof of conscious or intentional fraud, is settled. Citizens Casualty Co. of New York v. Zambrano Trucking Co., 140 N.J. Eq. 378 (Ch. 1947), affirmed 141 N.J. Eq. 310 (E. & A. 1948).
State Farm charges that it issued its policy in reliance on representations by Wall that his driving privileges had never been suspended or revoked and that he had not had any accidents *549 or "driver`s citations" during the previous three years, all of which representations are alleged to be false.
State Farm's adversaries contend that it has not borne its burden of proving the misrepresentation and reliance claimed. Further, they urge that State Farm has waived any right to rescission it may have had. Phillips, Simmons and Washington also argue that, at least to the extent of $10,000 for injury to one person and $20,000 for injury to more than one person, the policy is subject to the non-cancellation provisions of the Financial Responsibility Act, N.J.S.A. 39:6-46 et seq.
Wall's first meeting with a representative of State Farm was on January 19, 1962, at the Klugetown Shopping Center in Pompton Lakes. Thomas Voelkner, an authorized representative and sales agent of State Farm, was at the shopping center to secure "ex-dates," a method of obtaining leads to new business by approaching autoists entering or leaving the parking areas of the shopping center lot and ascertaining the expiration dates of their existing liability insurance policies. Some 30 days before the ascertained expiration date, Voelkner would communicate with the prospect and seek to convince him that it was advantageous to insure with State Farm instead of renewing his existing policy. Voelkner's conversation with Wall at the shopping center deviated from the usual pattern since Wall did not recall the expiration date of his liability policy. Voelkner gave Wall his phone number and a pamphlet describing State Farm's insurance policy.
Wall was the owner of a 1955 Pontiac automobile and a 1960 Chevrolet pickup truck. There was no insurance on the truck, but the Pontiac automobile, at least since April 2, 1957, had been covered by annually renewed liability insurance policies issued by Fidelity Phoenix Fire Insurance Company, with limits of $10,000-$20,000.
On March 3, 1962, after a telephone conversation setting up the appointment, Voelkner went to Wall's home. Voelkner says he examined Wall's existing policy. The insurance coverage which State Farm would afford was discussed. Then Voelkner completed and Wall signed forms of applications *550 for two liability insurance policies, to be written for six-month terms. One, covering the 1960 Chevrolet pickup truck, was to be effective March 12, 1962; the other, covering the 1955 Pontiac, was to be effective on April 2, 1962, when the existing Fidelity-Phoenix liability policy would expire.
In July 1962 Wall sold his 1955 Pontiac and purchased a 1962 Pontiac sports coupe. On July 11, 1962 Voelkner prepared and Wall signed an application for an insurance policy on the new automobile. That policy, effective July 11, 1962, was to expire on October 2, 1962, the termination date of the policy on the 1955 Pontiac which it replaced. However, the new policy included, in addition to liability and medical payment coverage, comprehensive and collision insurance coverage.
Among the questions on each application were the following:
(a) "(6) Has any insurer cancelled or refused to issue or renew, or given notice that it intends to cancel or refuse automobile insurance or any other insurance similar to that applied for, to the applicant or any member of his household within the past three years?"
(b) "(7) Has license to drive or registration been suspended, revoked or refused for the applicant or any member of his household within the past five years?"
(c) "Dates of accidents  unless none give details."
(d) "Driver citations last 3 years"
The answers appearing on the application to each of these questions is "No" or "None," except that the application relating to the Chevrolet pickup truck refers to an accident of February 13, 1962, in which the truck had skidded into a telephone pole, causing damage to the truck's headlight of "under $175" which Wall was "in the process of getting repaired."
The "Declarations" in the State Farm policies contain similar representations, viz: "No insurer has cancelled automobile insurance issued to the named insured or any member of his household within the past three years," and "no license to drive or registration has been suspended, revoked *551 or refused for the named insured or any member of his household within the past five years." The acceptance of the policies by Wall without protest or correction constituted an adoption of these representations. Citizens Casualty Co. v. Zambrano Trucking Co., Inc., 140 N.J. Eq. 378 (Ch. 1947), affirmed 141 N.J. Eq. 310 (E. & A. 1948); cf. Merchants Indemnity Corp. v. Eggleston, 37 N.J. 114, 121 (1962); Heake v. Atlantic Casualty Ins. Co., 15 N.J. 475 (1954).
The answers which denied that any insurance company had cancelled or refused to issue automobile insurance were true. But the other answers were not true. A "Certified Abstract of Operating Record" of Lawrence Wall, dated October 10, 1962, obtained by State Farm from the New Jersey Division of Motor Vehicles reveals  and these are the misrepresentations on which State Farm bases its claimed right of rescission  that (1) on June 21, 1961 Wall had been convicted in the Wayne Municipal Court of speeding, fined $25 and had his license revoked for one month; (2) on August 19, 1961 he had been involved in an accident, and for his failure to deposit security in connection with that accident had had his driving and registration privileges suspended from November 29, 1961 until December 8, 1961, when they were restored, and (3) on February 6, 1962 he was fined $15 in the Wayne Municipal Court for careless driving (Wall testified that this last involved the accident in which his truck had skidded into the telephone pole).
Wall contends that he should not be charged with the representations contained in the writings; that he signed the applications without reading them; that the questions were not read to him; that the only discussion with reference to license revocation was whether Wall's driver's license was then revoked or suspended, and the only reference to accidents related to the damage to the truck resulting from the February 1962 skidding incident.
Wall's testimony is contradicted by Voelkner. Voelkner says that on March 3, 1962, when the first two applications were signed, he had asked Wall each question appearing on *552 the application form and had inserted the answers which Wall gave him; that on July 11, 1962, when the third application was signed, he had asked Wall whether there had been any "changes" since the prior applications, and that he had handed the applications to Wall after they were completed and "assumed" that Wall had read them before signing.
Wall has failed to meet his burden of proving that the agent had inserted false answers to questions which he had truthfully answered. The evidence adduced is insufficient to relieve Wall of the representations contained in the writings which he signed and in the policies which he accepted and which he could have read, even if the fact be that he did not. See Heake v. Atlantic Casualty Ins. Co., 15 N.J. 475 (1954); Merchants Indemnity Corp. v. Eggleston, 37 N.J. 114, 121 (1962).
Misrepresentations have been proven. If they were relied on, the materiality of the representations is evident. But the question remains, did State Farm in fact rely on the truth of the representations in issuing the policy which it seeks to rescind? And what of the fact that the truth about Wall's driving and accident record, the gravamen of State Farm's present complaint, would have been revealed to it before the effective date of the policy and long before the accident, if it had obtained then, as it did in October 1962, more than one month after the accident, a certified abstract of Wall's operating record from the Division of Motor Vehicles for a fee of $1 (See N.J.S.A. 39:6-42).
State Farm has the burden of proving that in insuring Wall it did in fact rely on the truth of Wall's representations as to his driving record. To establish such reliance, State Farm offered the testimony of Edward J. Feiner, one of its underwriters, who had reviewed and approved Wall's original applications, as well as that of an underwriting supervisor, Russell J. Carney. Another underwriter, Wysock, had reviewed the July 1962 application. Feiner testified that if he had known of Wall's driving record, he would have been required to refer the application to his supervisor, Carney. *553 Carney testified that Wall's driving and license revocation record made him "ineligible" for insurance by State Farm, although he conceded that in some cases applicants with similar records had been accepted. According to him, this was done only after a thorough investigation of the applicant.
Carney acknowledged that some automobile insurance companies checked the records of the Division of Motor Vehicles with respect to each applicant for insurance; these, he said, are usually companies which "rate" drivers in determining the premium to be paid. State Farm does not normally check its applicant's Motor Vehicle Department records; it relies on the statements in the application.
The evidence establishes, however, that State Farm went beyond the application itself in determining whether to insure Wall. It had an investigation made by Service Review Incorporated, a firm which makes confidential investigations for insurance companies. Feiner testified that since the applications disclosed that Wall was unmarried, he ordered an investigation to ascertain what "use Wall made of his spare time," a practice which he "generally" followed in case of applicants who were single.
Despite State Farm's insistence that its investigation sought only this limited information about Wall, I am satisfied that this was but one of the areas toward which the investigation was directed. The form of Service Review's report makes it clear that in ordering the investigation State Farm sought what it actually received in Service Review's report, not only this special information but also information which an insurance company would normally be interested to learn about a prospective insured and his automobile.
The printed form of report submitted by Service Review called for that information under the following captions, "Business & Personal," "Vehicles (Uses)," "Drivers," "Storage-Territory," "Losses-Accidents," and "Motor Vehicle Records (when requested)." (Emphasis supplied)
Since State Farm did not request Service Review to obtain copies of the records of the Division of Motor Vehicles, none *554 was supplied. But it was otherwise complete. It revealed under the captions above noted that Wall was 33 years old, white, single, lived with his mother, had a net worth of $4,000 and an income of $5,000 per year; that he was employed, as he had been for about 11 years, by Owens-Illinois Co. of Riverdale, New Jersey, manufacturers of plastics, as a machine operator; that he met "financial obligations promptly and with no undue strain"; and that "no personal or moral criticism [were] learned from informants at the middle class residential section." As to the vehicles and their uses, it reported that the Pontiac was maintained in good condition, used two or three times a week in car pool commutation to the plant about two miles away; that on the other days Wall used his Chevrolet pickup truck, which was equipped with a plow and also used to do light hauling for the plant.
The report also disclosed that the automobile was stored in the driveway of Wall's home, situate on a street which was paved and moderately travelled and in an area where "crime and vandalism is low." As to "Losses and Accidents" the report states, "None learned."
Under the caption "Drivers" appears the following:

 "DRIVERS
 Under 25 No
 Over 60 No
 Impaired No
 Illiterate No
 Drink Hazard No
 New Driver No
 Suspension No
 Other Criticism No"

and in the narrative remarks,
"The insured [Wall] is the sole driver of the subject vehicle. He is said to be able and alert with no adverse criticism learned. The insured enjoys good health with no impairments or ailments to hamper his driving."
*555 As to his spare-time activities, the report revealed, on the basis of a conversation with Wall's mother, that he usually stays at home, spends time tinkering with his truck and car, dates "occasionally" and "sometimes goes out with male friends to bowl, etc.," and "no adverse criticism learned concerning excessive drinking or immoral activities."
After reviewing the report, Feiner decided that he wanted additional information. By writing dated May 2, 1962 he asked Service Review to "reopen" its investigation and report on:
"Damage on truck from 2/13/62 Loss  Ins. hit a pole  cover drink habits time of loss?
Also use of plow during winter. Who does he plow for  how often  other uses."
Service Review's supplemental report was received by State Farm on May 15, 1962.
In my opinion, State Farm has not met its burden of proving that, in fact, it did rely on the truth of Wall's representations as to his driving and revocation record.
In reaching that conclusion, I do not accept the contention made by counsel for Phillips, Washington and Simmons that State Farm is precluded from relying upon the misrepresentations because it had made its own investigation.
"The mere fact that an insurer makes an investigation does not absolve the applicant from speaking the truth nor lessen the right of the insurer to rely upon his statements, unless the investigation discloses facts sufficient to expose the falsity of the representations of the applicant or which are of such a nature as to place upon the insurer the duty of further inquiry." John Hancock Mutual Life Ins. Co. of Boston, Mass. v. Cronin, 139 N.J. Eq. 392, 398 (E. & A. 1947); Gallagher v. New England Mutual Life Ins. Co., 19 N.J. 14, 21-22 (1955).
Here, neither of the latter conditions have been met.
Nor is the issue whether the alleged reliance was reasonable. Some of the earlier cases spoke of "reasonable reliance," and some of the authorities still speak in terms of "justifiable *556 reliance." (See discussion in 5 Williston on Contracts (rev. ed.), § 1516; 2 Richards on Insurance (5th ed.), § 306, p. 1011; Judson v. Peoples Bank & Trust Co., 25 N.J. 17, 26 (1957). In Merchants Indemnity Corp. of New York v. Eggleston, 68 N.J. Super. 235 (1961), the Appellate Division's opinion (p. 244) set forth as a requirement "actual and reasonable reliance" by the insurer; the Supreme Court's affirmance (37 N.J. 114 (1962)) did not touch upon this phrase.
The test to be applied is whether in fact there was a reliance on the truth of the representation; whether the reliance was reasonable is immaterial. Gallagher v. New England Mutual Life Ins. Co., 19 N.J. 14 (1955); Bilotti v. Accurate Forming Corp., 39 N.J. 184, 205 (1963); Heake v. Atlantic Casualty Ins. Co., 15 N.J. 475, 483 (1954); Peter W. Kero, Inc. v. Terminal Construction Corp., 6 N.J. 361, 369 (1951).
Of course, this does not mean that the fact finder must accept at face value the alleged victim's testimony that he relied on the representation. Such testimony must be evaluated on the basis of all the evidence in the case. Conduct, action or inaction deemed credible where the victim is naive may take on a different complexion where the alleged victim is sophisticated and knowledgeable in the area of the representation.
State Farm, which had reached out to obtain the insurance business which Wall had theretofore given to another company, is not naive or uninformed. It is an automobile insurance company fully cognizant of the law of insurance, and familiar with what driving records are available in the Division of Motor Vehicles and the manner and nominal cost involved in obtaining an abstract thereof. Yet, in ordering and obtaining from a private investigating agency a detailed report about Wall, his activities and his automobile, it deliberately and purposely refrained from authorizing the expenditure of an additional $1 for a Division of Motor Vehicle abstract of Wall's driving record. Why, if in fact it was concerned with the truth as to Wall's driving record? Other representations *557 in the application were made the subject of part of the investigation  even those whose verification could not be obtained as simply as could a verification of the driving record.
The inference is compelling that State Farm did not then want to know, nor was it concerned with, whether or not Wall's representations as to his driving record were true, preferring rather to be in a position in which at some later date, if it served its interest to do so, it could seek rescission of the policy if the representations were untrue.
This is not reliance upon the truth of the representations; it is reliance on the expectation that relief will be afforded if the representations are untrue. As such, it is not sufficient to warrant rescission, just as it would not be sufficient reliance to warrant recovery of damages in an action for fraud and deceit. 3 Restatement, Torts, § 548 (1938). As the Restatement phrases it:
"The maker of a fraudulent misrepresentation is not liable to one who does not rely upon its truth but upon the expectation that the maker will be held liable in damages for its falsity."
An additional reason exists for denying relief to State Farm insofar as the claims of the injured parties, Phillips, Washington and Simmons, are concerned. In my opinion, when an accident occurs involving an insured automobile, the liability insurance company is precluded, as against the innocent victims of the accident, from seeking rescission of the policy based on the insured's misrepresentations as to his driving and accident record when the truth as to those representations might have been ascertained by the company by requesting an abstract of the insured's driving record from the Division of Motor Vehicles before the policy was issued.
When the only interests concerned are those of the two parties to the contract or transaction, "the general rule is that the mere fact that public records, if examined, would show the representee that representations of facts are false does not preclude his establishing fraud, because he is under *558 no duty to make such examination." 23 Am. Jur. 973, Fraud & Deceit, § 163; See also Annotation, 33 A.L.R. 919; Restatement, Torts, § 540, comment (b).
In the case of automobile liability insurance, the interests concerned are not limited to those of the insured and the insurer; also involved are the interests of those who have suffered injury as a result of the operation of the insured automobile (In re Gardinier, 40 N.J. 261, 265 (1963)), of the Unsatisfied Claim and Judgment Fund, and of the "strong legislative policy" (of this State) of assuring financial protection for innocent victims of automobile accidents. Indemnity Insurance Co. of North America v. Metropolitan Casualty Ins. Co., 33 N.J. 507, 512 (1960); see also Matits v. Nationwide Mutual Ins. Co., 33 N.J. 488, 496 (1960).
The ownership, operation and use of motor vehicles are subject to detailed statutory regulation and control. Motor vehicles must be registered (N.J.S.A. 39:3-4) and must be inspected periodically (N.J.S.A. 39:8-1 et seq.). Drivers must be licensed (N.J.S.A. 39:3-10). Records of motor vehicle ownership and operation are maintained, pursuant to statutory mandate, by the Director of the Division of Motor Vehicles (Director), and on request and on payment of designated nominal fees he is required to furnish certified copies of his records. (See e.g., N.J.S.A. 39:3-28; R.S. 39:3-36.)
Every law enforcement officer who investigates a motor vehicle accident is required to submit a written report of the accident for the use of the Director (N.J.S.A. 39:4-9). The Director's records include information as to out-of-state convictions for traffic law violations in cases where New Jersey and the other state have a reciprocal agreement for the exchange of such information (N.J.S.A. 39:4-9.1). Each judge or magistrate is required to make a written report to the Director of all cases heard before him for violation of the Motor Vehicle Law or for any other violation in which a motor vehicle was used in any way (N.J.S.A. 39:5-42). An appropriate entry is then made on the record maintained *559 by the Division of Motor Vehicles with respect to the driver involved. As the repository of all this accumulated information, the Director, upon request, furnishes a certified abstract of a driver's operating record (N.J.S.A. 39:6-42).
The "strong legislative policy of assuring financial protection for innocent victims of automobile accidents" finds expression in the several statutes dealing with financial responsibility and automobile liability insurance. Unsatisfied Claim and Judgment Fund Law, N.J.S.A. 39:6-61 to 39:6-91 (hereinafter "Fund Law"); Motor Vehicle Security-Responsibility Law, N.J.S.A. 39:6-23 to 39:6-60; Motor Vehicle Liability Security Fund Act, N.J.S.A. 39:6-92 to 39:6-104. These are not mere regulations of the relations between the insurer and the insured. Their purpose is to
"induce the owners and operators of motor vehicles to procure liability insurance and, therefore, mitigate the evil sought to be corrected by those laws  the helplessness of persons injured by financially irresponsible motorists in the maintenance and use of their motor vehicles." Proskurnja v. Elder, 73 N.J. Super. 466, 474 (Law Div. 1962).
So, the Fund Law, which seeks to
"provide a measure of relief to persons who sustain losses inflicted by financially irresponsible or unknown owners and operators of motor vehicles, where such persons would otherwise be remediless." Dixon v. Gassert, 26 N.J. 1, 5 (1958).
requires every person registering an uninsured motor vehicle to pay to the Director, in addition to any other fee prescribed by any other law, the "Unsatisfied Claim and Judgment Fund Fee" fixed by the Director for that registration license year, N.J.S.A. 39:6-63. The total amount of these fees, plus deficiency assessments levied against insurers writing liability insurance in this State are the revenues with which the Fund is maintained. N.J.S.A. 39:6-63.
Thus, it is critical to the administration of the Fund Law that the Division of Motor Vehicles know at the time a motor vehicle is registered whether or not it is insured. The application *560 for registration, the form of which is prescribed by the Director (N.J.S.A. 39:3-4), calls for that information, and if there is insurance, the name of the insurance company.
The additional fee paid on registering an uninsured vehicle, which may not exceed $15, is not an insurance premium; the Fund Law is not a substitute for an automobile liability policy; Lindsay v. Boles, 61 N.J. Super. 516 (Law Div. 1960). The fee is in the nature of a penalty imposed to stimulate the voluntary purchase of insurance. If the Fund Board pays a judgment on behalf of an uninsured driver, he remains obligated to reimburse it for the amount so paid plus interest; N.J.S.A. 39:6-77.
Although the rights of the injured party are derivative and arise from the rights of the insured under the policy, Dransfield v. Citizen's Casualty Co. of N.Y., 5 N.J. 190, 194 (1950); Kindervater v. Motorists Casualty Ins. Co., 120 N.J.L. 373 (E. & A. 1938), his interest is separate and distinct from that of the insured. So it is that a judgment rescinding the policy for fraud in an action brought by the insurer against the insured is not binding on the injured person who has not been joined as a party to that action. "In statutory intendment, there is not the privity between the named assured and the injured person essential to render the decree conclusive against the latter on the issue of fraud." Dransfield v. Citizens Casualty Co. of N.Y., supra, 5 N.J., at p. 194.
We are not dealing with representations as to facts which cannot be ascertained from the Division of Motor Vehicles. We are dealing with representations as to a driving record, as to which, by legislative mandate, the Division of Motor Vehicles maintains records and furnishes abstracts upon request.
Nor are we concerned here with the interest of the insured who misrepresented the facts. Our concern is with the interests of persons injured as a result of the operation of the automobile, for whom there exists the "strong legislative policy of assuring financial protection." Effectuation of this legislative policy, indeed "public policy" (see Bron v. *561 Weintraub, 42 N.J. 87, 93 (1964); Brooks v. Cooper, 50 N.J. Eq. 761, 769 (E. & A. 1893)), demands that if an insurance company deems representations as to its insured's driving record to be material, it should ascertain the truth of those representations before issuing the policy, by using the simple and inexpensive method provided for obtaining such information from the Division of Motor Vehicles. The insurer is thus compelled to determine and announce before the policy issues whether or not the driving record revealed by the abstract obtained from the Division of Motor Vehicles is such that it will not insure the applicant. If the insurer refuses to write the policy, then the applicant has the opportunity of affording the resulting protection to the public by purchasing insurance coverage elsewhere, albeit at higher rates, either privately or under the industry maintained "New Jersey Automobile Assigned Risk Plan." Or, if the applicant does not obtain liability insurance, he will be compelled to register his automobile as an uninsured vehicle and pay the required additional fee. In the instant case, if State Farm had not issued its policy to Wall, it is evident that he would have renewed the Fidelity Phoenix Fire Insurance Company liability policy which had been in effect since 1957 and which he abandoned when State Farm convinced him that it offered a better bargain.
State Farm has not established that it is entitled to the rescission which it seeks. It therefore becomes unnecessary to consider the special defenses raised by State Farm's adversary parties.
Submit judgment.