577 A.2d 131

GORDON B. WATTLES, SUBSTITUTED PLAINTIFF FOR ELIZABETH B. SHIELDS, PLAINTIFF–APPELLANT, v. EDWARD PLOTTS, HIS HEIRS, DEVISEES AND PERSONAL REPRESENTATIVES, AND HIS, THEIR OR ANY OF THEIR SUCCESSORS IN RIGHT, TITLE, AND INTEREST, UNKNOWN OWNERS OR UNKNOWN CLAIMANTS, THEIR HEIRS, DEVISEES AND PERSONAL REPRESENTATIVES AND THEIR OR ANY OF THEIR HEIRS, DEVISEES, EXECUTORS, ADMINISTRATORS, GRANTEES, ASSIGNS OR SUCCESSORS IN RIGHT, TITLE OR INTEREST AND ANY AND ALL PERSONS CLAIMING BY OR THROUGH THEM OR ANY OF THEM, AND "UNKNOWN OWNERS" (OR UNKNOWN CLAIMANTS), THEIR HEIRS, DEVISEES AND PERSONAL REPRESENTATIVES AND THEIR OR ANY OF THEIR SUCCESSORS IN RIGHT, TITLE AND INTEREST, JAMES L. PLOTTS, AND THE STATE OF NEW JERSEY, DEFENDANTS, AND IRMA HORROCKS, HARRY B. SHURTS, CLARENCE SCHEVREN, LUTHER GUISE, JANET C. CURRIN, JACOB S. CASTNER, AND GREGORY YOUNKIN, DEFENDANTS–RESPONDENTS.

Argued January 18, 1990—Decided July 25, 1990.

*Francis P. Sutton* argued the cause for appellant.

*Michael V. Kerwin* argued the cause for respondents.

The opinion of the Court was delivered by

POLLOCK, J.

Twenty-six years ago we condemned the business of "heir hunting" as having "no social value." *Bron v. Weintraub,* 42 *N.J.* 87, 95, 199 *A.*2d 625 (1964). The Legislature has since characterized heir hunting as a "questionable scheme" operated by "intermeddlers," an "iniquitous practice," and as a " 'racket.' " See *infra* at 450–451, 577 *A.*2d at 135–136; *Statement Accompanying Sen. No. 291, L.*1967, *c.* 149. This case presents a variation on the *Bron* theme.

Plaintiff, Gordon Wattles, instituted an action to foreclose a tax-sale certificate on a 6.21–acre parcel of vacant land, which is adjacent to other land owned by the Wattles family in Lebanon Township, Hunterdon County. After entry of a default against "unknown owners," but before the entry of judgment, an heir hunter, National Asset Recovery (National), discovered out-of-state heirs of the last record owner, Edward Plotts. National entered an agreement with the Plotts heirs. Under the agreement, if the heirs were successful in upsetting the tax foreclosure and in obtaining title, National could sell the property and divide the net profits with the heirs, after reimbursing itself for its expenses.

In the decisions below, the lower courts sustained the rights of the heirs to redeem the property. We granted Wattles' petition for certification, 117 *N.J.* 68, 563 *A.*2d 831 (1989). Although we agree that the heirs may redeem the property, we impose a constructive trust in favor of Wattles on National's interest. Accordingly, we modify the judgment of the Appellate Division, 230 *N.J.Super.* 254, 553 *A.*2d 365 (1990), and remand the matter to the Law Division.

I

On December 13, 1969, Elizabeth Shields and her late husband, Richard, purchased from Lebanon Township for $1,131.59 a tax-sale certificate covering a 6.21–acre parcel of vacant land described on the Township's tax map as lot 10, block 57. The last record owner, Edward Plotts, apparently had not paid taxes on the property in this century. After Richard's death, Elizabeth Shields assigned the certificate to her son, plaintiff, Gordon Wattles.

Wattles' lawyer conducted a sixty-year title search as required by *N.J.S.A.* 54:5–91. The lawyer also examined telephone books for Hunterdon and Warren Counties and discovered one James L. Plotts, whom he joined in the proceeding. Neither the title records nor James L. Plotts could provide any

information about the heirs of the last record owner, Edward Plotts. Consequently, Wattles instituted a tax foreclosure against "Unknown Owners" and served notice by publication in accordance with *Rule* 4:4–5. No one appeared in the proceeding, so Wattles took a default on July 9, 1986.

By scanning the notice of publication in the newspapers, National learned of the foreclosure action. Through the examination of early twentieth-century census data and other unrecorded documents, National learned that Edward Plotts had died in Maryland in 1899, leaving two daughters. Through the residuary clause in his will, similar clauses in the wills of his two daughters, and a series of devises and intestate successions, defendants acquired their interests in the property. Nothing in the record indicates that the daughters of Edward Plotts, the intervening heirs, or defendants had ever heard of the property. Indeed, some of the defendants had never heard of Edward Plotts, and others barely knew of him.

Having learned of the heirs, William Smith, National's president, wrote to them, soliciting their cooperation. In pertinent part, Smith's letter said:

> These lands are currently the subject of a tax foreclosure suit. The taxes have not been paid for a very long while, and the situation has now reached the point where the person doing the tax foreclosure is saying: (thru the courts) pay up these taxes now or forever lose the land to him.
>
> What National Asset Recovery offers, is quite simply, that we will advance the money to pay up those back taxes, along with the legal fees needed, as well as the costs of surveys, appraisals, documentation and genealogical research, and whatever else is needed to keep the property from being lost, and to turn it to a profit.
>
> We look to be reimbursed our out of pocket expenses, (and these from the sale of the asset), and then to split the profit with you as an equal partner. We never ask you for any money, or to do any of the work. We take care of everything for you and we take the financial risk.

The heirs responded, and signed a form agreement prepared by National, stating that National

> in its sole discretion shall have the right and authority to sell [the property] at public or private sale or sales, from which proceeds thereof any and all advances made by it shall first be deducted and paid over to [National], and the proceeds thereof distributed in accordance with this agreement.

"In consideration for the services rendered and to be rendered" by National, the heirs agreed "to set over, transfer and assign to [National] fifty per cent in the net value of the [property]." The heirs retained the right to match any *bona fide* offer received by National. The parties also agreed that the heirs

> shall execute whatever written instruments as the case may require, or as may be required by [National] to protect its rights, title and interest in such asset to the extent of the fee agreed upon herein. The said written instruments shall set forth as inviolate the absolute undivided interest of [the heirs and National] as tenants in common.

Both lower courts recognize that at the heart of this case is our decision in *Bron,* in which Woodbridge Township sold vacant lands for unpaid taxes in 1935, and in 1940 foreclosed the tax-sale certificates. The proceeding, however, was defective because it had omitted the last record owner, one Weintraub. Thereafter, Woodbridge conveyed the tract to a developer, who built and sold ten homes. In 1959, when one of the homes was resold, a title search revealed the failure in the original proceeding to have foreclosed the Weintraub interests. Consequently, Woodbridge instituted a second proceeding to foreclose those interests. After entry of a judgment fixing the date by which Weintraub's unknown heirs were to redeem, heir hunters, Hudson Trading Corp. and Frank Altomare, discovered the Weintraub heirs and wrote them a letter that this Court found to be "palpably deceptive." *Bron, supra,* 42 *N.J.* at 91, 199 *A.*2d 625. The hunter paid them the nominal sum of $50 each, or a total of $400 for their interests.

In a powerful opinion, former Chief Justice Weintraub wrote:

> With respect to the factual pattern before us, no one disputes the right of the holders of existing interests to convey them to third persons if they wish. What is challenged is the legality of the intrusion into the scene by third persons who seek only to further their own interests rather than the interests already on hand. As we have pointed out, the policy of the statute is to support tax titles, a policy which overall is burdened by the conduct before us. The burden upon individuals situated as are the householders in this case is evident enough. These manifest hurts should not be tolerated unless it can be said that some other legitimate interest or advantage is served. We find none. We see no social value or contribution in the activities of Hudson. On the contrary,

decent men must sense only revulsion in this traffic in the misfortunes of others. [*Id.* at 95, 199 *A.*2d 625 (citation omitted).]

Recognizing that its action was unprecedented, the Court anchored the opinion in public policy. *Id.* at 96, 199 *A.*2d 625. The Court concluded that "[w]e have no doubt the common conscience condemns the conduct of Hudson and Altomare as undue interference with the rights of the householders." *Ibid.*

In devising a remedy, the Court wrote:

Hudson and Altomare having acquired the outstanding title under "circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same." The householders are equitably entitled to the property upon the payment of the sum of $400 plus simple interest from the date of the payment to the Weintraub heirs. [*Ibid.* (citation omitted).]

Here, the trial court ruled that defendants were heirs of Edward Plotts and entered final judgment permitting them to redeem. The Appellate Division affirmed. 230 *N.J.Super.* 254, 553 *A.*2d 365 (1989). It concluded that *Bron* did not provide Wattles with any basis for relief. As distinguished from *Bron,* in which the homeowners had purchased from the township after the foreclosure, the court found that no equities intervened in favor of Wattles. Noting that tax-sale statutes acknowledge the owner's right of redemption, the court saw "no reason why the heir of such an owner should be barred from his or her right of redemption simply because their right to redeem was brought to their attention by an heir hunter and they entered into a generous agreement with the heir hunter * * *." 230 *N.J.Super.* at 260, 553 *A.*2d 365. The court acknowledged the argument, originally recognized in *Bron,* that the last-minute intervention of heir hunters in tax-foreclosure proceedings would hinder the purchase of tax-sale certificates to the detriment of municipalities eager to receive tax revenues. It declared, however, that the potential detriment was a problem for the Legislature. *Ibid.* The court also found inapplicable *N.J.S.A.* 54:5–89.1, which provides in pertinent part:

No person, however, shall be admitted as a party to such action, nor shall he have the right to redeem the lands from the tax sale whenever it shall appear

that he has acquired [an interest in or an encumbrance or lien upon property sold for unpaid taxes, by conveyance, mortgage, assignment, lien, or any instrument capable of being recorded, registered, entered, or filed in any public office in this State] for a nominal consideration after filing of the complaint * * *.

The Appellate Division recognized that National may have acquired an interest in the property under its contract with the heirs. 230 *N.J.Super.* at 259, 553 *A.*2d 365. Nevertheless, it found the statute inapplicable because the redeeming party was not the heir hunter, but the heirs themselves.

## II

Immediately following our decision in *Bron,* the Legislature amended the Tax Foreclosure Act to provide that under certain circumstances the owner of a single-family residence, title to which derives from a defective tax foreclosure, could obtain the outstanding interest of a previously-unknown owner. *N.J.S.A.* 54:5–104.100 to –104.103. Three years later, in response to an unreported Appellate Division decision that sought to limit *Bron* to its facts, the Legislature further amended the tax-sale law by amending *N.J.S.A.* 54:5–89.1.

Thus, the statute prohibits anyone from becoming a party to a tax-foreclosure proceeding or from exercising the right to redeem if that person has acquired for a nominal consideration an interest in the property after the filing of a tax-foreclosure complaint. See *Walter v. Sand,* 191 *N.J.Super.* 362, 369, 466 *A.*2d 986 (App.Div.1983) (holding that adjacent property owner had "bona fide interest" in becoming owner of subject property and that she could redeem tax-sale certificate on it because she had acquired her interest, albeit for a nominal consideration, before filing of tax-foreclosure complaint).

In an unusually emphatic statement accompanying the statute, the Legislature denounced the practice of heir hunting. The statement reads:

The purpose of the above supplement to the Tax Sale Revision is to curb a very questionable scheme that has recently been carried on in a wholesale

fashion in the northern counties of the State to the disadvantage of plaintiffs (municipalities and individuals, alike) in tax foreclosure actions.

Although our present statute (*N.J.S.A.* 54:5–89.1) permits *bona fide* purchasers and mortgagees who have acquired their interests in lands while a foreclosure action is pending, to be admitted as parties to the action and make redemption, unauthorized persons, having no existing interests in the proceedings or the title to the lands, have made a practice of checking the notices of *lis pendens* that are filed in such suits in the county recording offices, to ascertain the nature of the action and the property affected. Armed with that information, they examine the dockets and files relating to the actions in the office of the Clerk of the Superior Court (or the copies in the office of the county clerk) to ascertain the names and the addresses of the defendants in the cause from whom they then indiscriminately solicit conveyances of title, or other interests in the lands under foreclosure, always for a nominal consideration, usually $25.00 or 50.00, which they characterize as a courtesy consideration in dealing with those they solicit. They thereupon force themselves, without leave or welcome, either directly into the pending proceedings, or indirectly, by paying to the tax collectors the redemption sums fixed by the court on the basis of an ostensible interest, thereby eliminating the tax lien holder.

In short, their interest is not inspired by their desire to purchase the lands, but solely because of the pendency of the foreclosure action. They are not *bona fide* purchasers or grantees.

The scheme of these intermeddlers is simple. They permit the purchaser of the tax sale certificate to invest his capital, hold the line for the statutory period, engage counsel to examine the title, make inquiry as to the whereabouts of the defendants, their heirs, devisees, and personal representatives, prosecute the case up to the point of completion, and upon being satisfied at that time that the defendants do not intend to redeem, such intermeddlers offer the defendants a nominal sum for a deed and they thereupon step into the shoes of the purchaser of the lien. At that stage they find the defendants very amenable to any suggestion that they might make because they have nothing to lose—the defendants have already determined to abandon their interests. In the meantime, the intermeddlers have made no investment of any kind and fully exploit the professional services of the attorney for the plaintiff at little or no cost. Obviously, this imposes a loss on the purchaser of the tax sale certificate.

This iniquitous practice constitutes a burden on the purpose of the Tax Sale Revision, namely, the collection of revenue. No one will purchase at tax sales under these conditions.

The members of the bar representing the plaintiffs in such suits have been thoroughly frustrated. Recently an effort was made in the courts to stop the practice on equitable grounds, but this was not successful. Government Security Co. v. Behnke, Docket No., A–72–64 (App.Div. Nov. 18, 1965), certification denied by the Supreme Court, Docket No. 4951, February 1, 1966). *Only a legislative enactment will eliminate this "racket."* [*Statement accompanying Sen. No. 291, L.*1967, *c.* 149. (emphasis added).]

In sum, the Legislature censured heir hunting because it hinders tax sales, thereby disturbing the collection of unpaid taxes. Furthermore, by taking advantage of the expenses incurred by the foreclosing party, the heir hunter creates a windfall.

The words of the statute do not reach as far as the legislative statement. For example, the statute does not affect the interest of the heir, as distinguished from that of the heir hunter. Nor does it apply if the heir hunter acquires its interest before the institution of the foreclosure proceeding or if it pays more than a nominal consideration for that interest.

Nothing in the statute, however, undercuts *Bron*. Although the statute might have been drawn more broadly to achieve its stated purpose, the operative provisions are consistent with the public policy declared in *Bron*. That policy supports tax titles and opposes the intrusion in tax-foreclosure proceedings "by third persons who seek only to further their own interests rather than the interests already on hand." 42 *N.J.* at 95, 199 *A.*2d 625. As the statement accompanying the legislation makes clear, the Legislature enacted *N.J.S.A.* 54:5–89.1 not to limit *Bron*, but to counteract an unreported Appellate Division opinion that failed to stop the practice of heir hunting "on equitable grounds." *Statement Accompanying Sen. No. 291, L.*1967, *c.* 149. We conclude, therefore, that rather than undermining *Bron*, as defendants contend, *N.J.S.A.* 54:5–89.1 reinforced its policies. Our inquiry, therefore, focuses on the effect of *Bron* on the present case.

## III

Here, as in *Bron*, the foreclosure proceeding aroused the heir hunter's interest. In *Bron*, the heir hunter offered a nominal consideration of $50 each for the interests of the heirs. Here, the heir hunter agreed to share the net profits equally with the heirs. Given the present value of the property, assessed at $162,000 in 1988–89, the Plotts heirs stand to gain much more

than the Weintraub heirs in *Bron*. Unlike in *Bron*, moreover, the heir hunter did not take title in its own name. Instead, it relies on its contract with the heirs. That contract provides that the heirs will execute all instruments necessary to constitute the heir hunter a tenant in common with them. As an executory contract for the sale of an interest in land, the contract vests National with an equitable interest in land. *Haughwout and Pomeroy v. Murphy*, 22 *N.J.Eq.* 531, 546 (E. & A. 1871); 2 J.N. Pomeroy, *Equity Jurisprudence* § 368 (5th ed. 1941). Additionally, the contract authorizes National to sell the land, subject to the rights of the heirs to meet any good-faith offer. The net result is that the heirs have retained a bare legal interest and that National has acquired an equitable interest with certain incidents of absolute ownership, including the right to sell.

In *Bron*, where the heir hunter had acquired legal title, we imposed a constructive trust on the heir hunter's interest and held that the homeowners could obtain that interest by paying to the heir hunter the $400 it had paid to the heirs. 42 *N.J.* at 96, 199 *A.*2d 625. For all practical purposes, National is in the same posture as the heir hunters in *Bron*. It has insinuated itself into the scene for the sole purpose of furthering its own pecuniary interests. As in *Bron*, to the extent that the heir hunter's efforts are designed to thwart the utility of tax sales and to reap windfall profits, they advance no social value. In this context, we are unpersuaded that the lack of intervening equities, such as were presented by the homeowners in *Bron*, should make a difference. We believe that the appropriate remedy, as in *Bron*, is to impose a constructive trust on the heir hunter's rights under the contract with the Plotts heirs. Consequently, on agreement to the terms of the contract between National and the Plotts heirs, including payment of fifty per cent of the net proceeds to the heirs after a sale, Wattles shall succeed to National's rights, including the right to sell the property at his discretion. The heirs, however, shall retain their interest under the contract, including their right to re-

deem, their right to fifty per cent of the profits after expenses, and their right to match a *bona fide* offer. Before distributing the sale proceeds, Wattles and the heirs shall reimburse National for its reasonable expenses under the contract.

The judgment of the Appellate Division is modified, and the matter is remanded to the Chancery Division.

*For modification and affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*— None.