915 A.2d 489

RICHARD SIMON, TRUSTEE, PLAINTIFF–APPELLANT, v. RICH-
ARD WILLIAM CRONECKER, HIS HEIRS, DEVISEES AND
PERSONAL REPRESENTATIVES, AND THEIR OR ANY OF
THEIR SUCCESSORS IN RIGHT, TITLE AND INTEREST;
MRS. RICHARD WILLIAM CRONECKER; EMMETT W. ROSS,
HIS HEIRS, DEVISEES AND PERSONAL REPRESENTA-
TIVES, AND THEIR OR ANY OF THEIR SUCCESSORS IN
RIGHT, TITLE AND INTEREST; HELOISE B. LEVIT AND

SUSAN FISCH, INDIVIDUALLY AND AS EXECUTRICES OF THE ESTATE OF CLAIRE BERTMAN, DECEASED; LUPE H. SNYDER, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF FRANKLYN R. SNYDER, DECEASED; PAULINE M. CASSEL A/K/A PAULINE MOOCK CASSEL; PAUL C. MOOCK, JR., INDIVIDUALLY AND AS EXECUTOR OF THE ESTATE OF MARGARET S. MOOCK, DECEASED; RONALD SMITH AND LOIS SMITH, HIS WIFE; SAMUEL W. NEWMAN, ESQUIRE, EXECUTOR OF THE ESTATE OF BLANCHE B. MOOCK, DECEASED; C. HOWARD MOOCK, HIS HEIRS, DEVISEES AND PERSONAL REPRESENTATIVES AND THEIR OR ANY OF THEIR SUCCESSORS IN RIGHT, TITLE AND INTEREST; CLARK S. REESE, INDIVIDUALLY AND AS EXECUTOR OF THE ESTATE OF ELIZABETH R. MOOCK, DECEASED; ANNIE LANGENFELD; JOSEPHINE M. ROSS; FUNB–CUSTODIAN FOR FUNDCO, INC.; STATE OF NEW JERSEY; UNKNOWN OWNERS/UNKNOWN CLAIMANTS, THEIR HEIRS, DEVISEES AND PERSONAL REPRESENTATIVES, AND THEIR OR ANY OF THEIR SUCCESSORS IN RIGHT, TITLE AND INTEREST, DEFENDANTS, AND CHERRYSTONE BAY, LLC, INTERVENOR–RESPONDENT.

NICHOLAS GRIVAS, PLAINTIFF–APPELLANT, v. LORETTA SMYTH AND RICHARD SMYTH, HER HUSBAND, DEFENDANTS–RESPONDENTS, AND FLORENCE BARILOTTI AND GEORGE BARILOTTI, HER HUSBAND; HELEN CIANDRA AND FURIO CIANDRA, HER HUSBAND, THEIR HEIRS, DEVISEES AND PERSONAL REPRESENTATIVES, AND THEIR OR ANY OF THEIR SUCCESSORS IN RIGHT, TITLE AND INTEREST; JOSEPHINE MARENGO, WIDOW; JOHN BARLETTO AND ROSE BARLETTO, HIS WIFE; PAUL BARLETTO AND JULIA BARLETTO, HIS WIFE; STATE OF NEW JERSEY; BUREAUS INVESTMENT GROUP # 4 LLC AND HARRY TINI, DEFENDANTS, AND CHERRYSTONE BAY, LLC, INTERVENOR–RESPONDENT.

Argued September 12, 2006—Decided January 29, 2007.

*Keith A. Bonchi,* argued the cause for appellants (*Goldenberg, Mackler, Sayegh, Mintz, Pfeffer, Bonchi & Gill,* attorneys).

*Anthony L. Velasquez,* argued the cause for intervenor-respondent Cherrystone Bay, LLC in (A–105–05) *Simon v. Cronecker.*

*Steven W. Griegel,* argued the cause for respondents Loretta Smyth and Richard Smyth (*Roselli Griegel,* attorneys).

*Maeve E. Cannon,* argued the cause for intervenor-respondent Cherrystone Bay, LLC in (A–106–05) *Grivas v. Smyth* (*Hill Wallack,* attorneys; *Mark K. Smith,* on the brief).

Justice ALBIN delivered the opinion of the Court.

In the two consolidated appeals before us, plaintiffs are holders of tax sale certificates covering the unpaid municipal taxes and charges on defendants' properties. Plaintiffs have instituted actions to foreclose on the tax certificates, and defendants stand to lose their properties unless they can redeem those certificates within the time prescribed by law. A third-party investor contracted to purchase defendants' properties and arranged for the redemption of the tax certificates, without intervening first in the foreclosure action.

Plaintiffs claim that the eleventh-hour intermeddling by the third-party investor, frustrating their efforts to foreclose on defendants' properties, violates the Tax Sale Law and this Court's decisions in *Bron v. Weintraub,* 42 *N.J.* 87, 199 *A.*2d 625 (1964) and *Wattles v. Plotts,* 120 *N.J.* 444, 577 *A.*2d 131 (1990). They reason that thwarting the foreclosure action will diminish the market for tax certificates and thus increase the number of untaxed properties on the rolls of municipalities. Defendants and the third-party investor respond that property owners have both a statutory and constitutional right to sell their property, as defendants did here for substantial consideration. They contend that their contractual arrangements for redeeming the tax certificates will avert an unwarranted forfeiture of all of defendants' equity in their properties.

The trial court permitted the redemption of the tax certificates, finding that the third-party investor paid significant consideration for defendants' properties. We granted direct certification because of the importance of the issues raised in both cases. 188 *N.J.* 259, 905 *A.*2d 869 (2006).

These cases illustrate that competition in the marketplace can yield considerable social good. Here, in pursuing their self-

interests to maximize profits, the tax sale certificate holders and third-party investor also produce important societal benefits—the certificate holder puts property back on the tax rolls and the third-party investor helps a property owner salvage a piece of his equity. We do not read the Tax Sale Law, *N.J.S.A.* 54:5-1 to – 137, to discourage commercial competition that is likely to benefit a financially-strapped property owner, and we will not interfere with salutary market forces for the purpose of impoverishing him.

In balancing the conflicting interests in these cases, we now hold that the Tax Sale Law does not prohibit a third-party investor from redeeming a tax sale certificate after the filing of a foreclosure action, provided that the investor timely intervenes in the action and pays the property owner more than nominal consideration for the property. However, because the third-party investor here did not intervene in the foreclosure actions before arranging for redemption of the tax certificates, the investor will not be permitted to profit from the transactions. To protect defendants' interests, we impose constructive trusts, allowing plaintiffs to succeed in the third-party investor's place. For those reasons, we reverse the judgment of the trial court.

## I.

### A.

#### *Simon v. Cronecker*

At a tax sale auction in October 1999, Sea Isle City put up for bid a tax sale certificate covering the unpaid sewer charges and real estate taxes on four lots owned by Mary E. Ross in that municipality.[1] The successful bidder, plaintiff Richard Simon (Simon), purchased the tax certificate valued at $4841.40, agreeing to satisfy the tax and sewer arrearages on the Ross property. At the auction, the interest rate on the certificate was fixed at twelve percent per annum.

---

[1] The Ross family had owned the property for almost seventy years as of 1998.

Over the next four years, Simon continued to pay the property taxes and sewer costs. In October 2003, Simon filed an action to foreclose on the tax certificate and thereafter amended the complaint multiple times to identify those with a potential interest in the Ross property.[2] Among those named were the heirs of Mary and Emmett W. Ross. Their grandchild, defendant Emmett W. Ross, Jr. (Ross), acquired his interest through his grandmother's will. By court order, August 22, 2005 was set as the last possible day for a person with a valid property interest to redeem the tax sale certificate, then valued at approximately $56,000. Simon stood poised to foreclose on the property.

Cherrystone Bay, LLC (Cherrystone), the intervenor in this case, is in the business of investing in properties subject to foreclosure. Through a search of public records, Cherrystone learned of Simon's foreclosure complaint and obtained the information necessary to contact Ross. Cherrystone then contracted with Ross to purchase Ross's property interest for $250,000. Ross claimed that he had been unable to find a buyer for the property until Cherrystone made its overture. On August 22, 2005, the last day to redeem the tax sale certificate, Cherrystone and Ross closed on the property. That same day, Ross and a title company representative delivered a cashier's check to the tax collector's office in the amount necessary for the redemption of the tax sale certificate. Up to that point, Cherrystone had not sought to intervene in the foreclosure action and apparently had not revealed its legal rights to the Ross property. Although the tax collector accepted the redemption check, Simon refused to surrender the tax sale certificate, claiming that the redemption was illegal.

In September 2005, Simon filed a motion to bar the redemption of the tax sale certificate, and in response Cherrystone for the first time moved to intervene in the foreclosure action. Plaintiff

---

[2] Eventually, all the heirs, devisees, and personal representatives of Emmett W. Ross were captioned as parties to the action.

Simon and intervenor Cherrystone then became locked in a battle for the rights to the property.

ˋAn appraisal valued the Ross property at approximately $1,200,000. After deducting from the property's purchase price of $250,000, the $56,000 value of the tax sale certificate and the amounts placed in escrow to cover a judgment and overdue taxes, Ross was left with a cash disbursement of $63,422.77. Cherrystone asserted that Ross would receive more cash-in-hand from the escrowed funds if the amount of the outstanding judgment were reduced. In any event, Cherrystone maintained that Ross was gaining a "true benefit" with the use of the escrowed funds for the satisfaction of the judgment.

B.

*Grivas v. Smyth*

The City of Wildwood conducted a tax sale auction in 1996, putting up for bid a tax certificate covering back real estate taxes on property owned by defendant Smyth family.[3] First Union National Bank purchased the tax certificate, valued at $2,893.59. The auction set the interest yield rate at fifteen percent per annum. Six years later, First Union assigned the certificate for one dollar to plaintiff Nicholas Grivas (Grivas), who thereafter paid taxes on the property.

In January 2004, Grivas filed a complaint to foreclose on the tax certificate. The last day for redemption of the certificate, then valued at almost $90,000, was scheduled for March 14, 2005. Eleven days before the redemption date, Cherrystone contacted Richard and Loretta Smyth, expressing interest in purchasing the property. With the looming prospect of losing all the equity in their property in the foreclosure action, the members of the

---

[3] The property owners were Loretta and Richard Smyth, and Loretta's siblings and their spouses: Florence and George Barilotti; Helen and Furio Ciandra; Josephine and Ralph Marengo; John and Rose Barletto; and Paul and Julia Barletto.

extended Smyth family decided to sell their interests to Cherrystone.[4]

Thereafter, Cherrystone contracted with the Smyths to purchase the property for $200,000.[5] A real estate broker's opinion letter estimated the value of the property to be between $325,000 and $350,000. One day after the last date set for redemption but before the entry of final judgment, Richard and Loretta Smyth met with Cherrystone's owner and attorney at the Wildwood tax collector's office and tendered a redemption check for approximately $97,000 in the name of "Cherrystone Bay, LLC (Loretta Smyth)." The tax collector refused to accept the check on the basis that Cherrystone was not a party in the foreclosure action and therefore was statutorily barred from participating in the redemption process.

A foreclosure judgment entered in favor of Grivas had to be vacated due to defective service of process on the Smyths. The last day to redeem the tax certificate was then set for September 8, 2005. A week before that date, the Smyths and Cherrystone closed on the property, and the Smyth family received $90,623.48 from the sale. On September 6, 2005, the Smyths' attorney delivered to the tax collector's office a check in the amount necessary to redeem the tax sale certificate. Although the tax collector accepted the redemption check, plaintiff Grivas refused to release the tax sale certificate and discharge the lien on the property. Grivas then moved to bar the redemption, and Cherrystone cross-moved to compel Grivas to discharge the tax lien.

## C.

The Chancery Division addressed the motions in *Simon v. Cronecker* and *Grivas v. Smyth* together. In both cases, plaintiffs

---

[4] Apparently, the Smyth family did not act as one unified bloc because on March 14, 2005, Joseph Barletto transferred his interest in the property to Cherrystone for $25,000 for a separate quitclaim deed.

argued that *Bron, Wattles,* and the Tax Sale Law bar a third-party investor from intermeddling in the redemption process after the filing of a tax sale foreclosure complaint. Conversely, Cherrystone and defendants contended that the Tax Sale Law only prohibits a third-party investor from intervening to redeem the tax sale certificate in the post-foreclosure complaint process when the property owner surrenders his interest in the property "for a nominal consideration." *See N.J.S.A.* 54:5–89.1.

In a thorough and well-reasoned opinion, Judge William C. Todd, III held that under the Tax Sale Law the property owners were entitled to redeem the tax sale certificates through third-party financing arrangements with Cherrystone, even after the filing of the tax sale foreclosure complaints. Judge Todd determined that neither *Bron* nor *Wattles* squarely addressed the issue in the present cases—a post-complaint third-party investor offering more than nominal consideration to property owners. He noted that in *Bron* and *Wattles* the post-foreclosure-complaint third-party investors were described as "heir hunters" and "intermeddlers" preying on distant and vulnerable heirs, who, at least in the *Bron* case, were offered inadequate consideration for their property interests. In the present cases, Judge Todd observed "a new and different dynamic"—significant benefits to the property owners by the involvement of third-party investors. He concluded that *Bron* and *Wattles* should not be extended to the facts here because the third-party investor had paid "substantial consideration" to acquire the owners' interests in their properties.

Judge Todd recognized that the Tax Sale Law embodied two competing public policy goals—one to enhance the tax-collecting ability of municipalities by encouraging tax sale foreclosures and the other to protect property owners from the devastating consequences of foreclosure. He expressed "the need to strike some balance between the interests of purchasers of tax sale certificates and the interests of property owners." Judge Todd found that balance in *N.J.S.A.* 54:5–89.1, which requires that after the filing of a tax sale foreclosure complaint, a third-party investor must

provide an owner with more than nominal consideration for his property interest. In both cases, he concluded that Cherrystone gave substantial consideration to the property owners, thereby satisfying the dictates of *N.J.S.A.* 54:5–89.1.

Judge Todd finally reasoned that permitting redemption would not place an "undue burden" on the present tax certificate holders because they still would receive the benefit of their bargain: "[R]eimburse[ment] for all the monies they advanced, with interest at the rates established at the original tax sales [twelve percent for Smyth and fifteen percent for Grivas]." Because "plaintiffs were aware that [their] properties would be subject to redemption in any number of ways from the time they elected to acquire the tax sale certificates," he determined that plaintiffs should have had no false expectation that their purchases of tax certificates were guaranteed to end in foreclosure of the properties.

Judge Todd permitted Cherrystone to intervene and approved of the redemption of the tax sale certificates. Simon and Grivas appealed. While their cases were pending before the Appellate Division, we granted direct certification pursuant to *Rule* 2:12–1.

## II.

Plaintiffs present three reasons in support of reversing the trial court. First, they argue that based on our decisions in *Bron* and *Wattles* there is a strong public policy against allowing third-party investors to thwart a foreclosure action after the filing of a foreclosure complaint. They view Cherrystone not as a "competitor," but as a parasitic speculator that searches complaint files for the names of owners facing foreclosure of their properties. With few options available, the vulnerable owners are primed to surrender their property interests to the intermeddler for a trifling consideration. The intermeddler then arranges for the redemption of the tax certificate. Plaintiffs submit that frustrating the certificate holder's reasonable expectation of foreclosure and fee

simple ownership will decrease the market for tax certificates and thus undermine municipal tax revenues.

Second, plaintiffs submit that Cherrystone failed to intervene in the foreclosure actions as required by *N.J.S.A.* 54:5–98 and *N.J.S.A.* 54:5–89.1 and, as such, is statutorily barred from redeeming, directly or indirectly, the tax sale certificates. Last, they posit that Cherrystone should not be permitted to benefit from a windfall profit because it offered only "nominal consideration" to the property owners in violation of *N.J.S.A.* 54:5–89.1.

In seeking an affirmance of the trial court's decision, Cherrystone and defendants respond that no statute or case prohibits a person from searching "the public records to determine if a foreclosure is pending and then seek[ing] to acquire an interest" from the property owner.[6] They claim that an investor who purchases property for "real and valuable consideration" and allows the owner facing foreclosure to pay the tax certificate holder "his full return and interest" furthers the public policy of our Tax Sale Law. They argue, moreover, that to deny defendants the right to redeem the certificates by third-party financing, thus resulting in forfeiture of their properties, would violate both the Tax Sale Law and the property-right protections of the Federal and State Constitutions. They note that plaintiffs could have offered to purchase the property owners' interests before Cherrystone entered the scene, preempting the competition, but instead gambled that they could acquire title through tax sale foreclosures before the owners could find buyers for their properties. Cherrystone and defendants also state that more than nominal consideration was offered for the properties, thus complying with *N.J.S.A.* 54:5–89.1. Last, they submit that Cherrystone was not obligated to intervene in the foreclosure action pursuant to *N.J.S.A.* 54:5–98 and *N.J.S.A.* 54:5–89.1 and that any require-

---

[6] We will assume that Ross, who did not file a brief, relies on Cherrystone's arguments, which advances their common interest.

ment to the contrary would constitute "an unconstitutional infringement upon the right of an owner to sell" his property.

We therefore must address three separate questions: 1) whether in the post-foreclosure complaint stage, the Tax Sale Law bars a property owner from selling property to a third-party investor, who finances the redemption of the tax certificate as a condition of the sale; 2) whether Cherrystone paid more than nominal consideration for defendants' properties; and 3) whether Cherrystone's failure to intervene in the foreclosure action before arranging the tax certificates' redemption disqualified it from profiting from the transactions. To answer those questions, we must turn to the Tax Sale Law, *N.J.S.A.* 54:5–1 to –137, which delineates the competing rights of tax certificate holders and property owners.

## A.

Municipal governments depend on real estate taxes and other property-related assessments as their primary sources of revenue. When those taxes or assessments remain unpaid for a period of time, the municipality is granted "a continuous lien on the land" for the delinquent amount as well as for "all subsequent taxes, interest, penalties and costs of collection." *N.J.S.A.* 54:5–6; *see also N.J.S.A.* 54:5–7 to –8. The Tax Sale Law converts that lien into a stream of revenue by encouraging the purchase of tax certificates on tax-dormant properties. *See N.J.S.A.* 54:5–19, –31 to –32; *Varsolona v. Breen Capital,* 180 *N.J.* 605, 620, 853 *A.*2d 865 (2004) ("The Legislature created the [Tax Sale Law] as a framework to facilitate the collection of property taxes."). A tax sale certificate validates the amount of unpaid taxes and assessments on the property described in the certificate. *N.J.S.A.* 54:5–11 to –13. The sale of a tax certificate is a conditional conveyance of the property to the purchaser, subject to a person with an interest in the property having the right to redeem the certificate, as prescribed by statute. *See N.J.S.A.* 54:5–31 to –32, –46. Unless redemption occurs, however, a purchaser who forecloses on the tax certificate becomes the owner of the property in fee simple. *N.J.S.A.* 54:5–87.

Municipalities are authorized to sell the certificates at a public auction on notice to the property owners. *N.J.S.A.* 54:5–25 to – 27, –31 to –32. The successful bidder on a tax sale certificate agrees to pay to the municipality the taxes or assessments due on the property, as advertised, *N.J.S.A.* 54:5–31 to –32, –46, and, may record the certificate with the appropriate county official "as a mortgage on the land." *N.J.S.A.* 54:5–50. The auction works in reverse, with the person accepting the lowest interest yield rate on the tax sale certificate winning the bid. *N.J.S.A.* 54:5–32. The bidding begins at a high of eighteen percent per annum interest. *Ibid.*

There are two possible ways to benefit from the purchase of a tax sale certificate. First, the certificate holder is entitled to reimbursement for all taxes and assessments paid on the property, as well as accrued interest and related costs, if the owner redeems the certificate. *See N.J.S.A.* 54:5–58 to –60. Second, if the property owner does not redeem the tax certificate within two years of the auction, the holder may acquire title to the property free and clear by "institut[ing] an action to foreclose the right of redemption" against anyone with an interest in the land. *N.J.S.A.* 54:5–86 to –87.

Although the primary purpose of the Tax Sale Law is to encourage the purchase of tax certificates, another important purpose is to give the property owner the opportunity to redeem the certificate and reclaim his land. Significantly, the property owner and others with an interest in the land (an heir, a prior tax certificate holder, a mortgagee, or an occupant) have the right to redeem the tax sale certificate at anytime before the final date for redemption set by the court, *N.J.S.A.* 54:5–54, and "until barred by the judgment of the Superior Court." *N.J.S.A.* 54:5–86; *see also R.* 4:64–6(b) ("Redemption may be made at any time until the entry of final judgment....").[7] Accordingly, the certificate hold-

---

[7] The foreclosure process requires certificate holders to give thirty days written notice to all parties with a property interest before filing the complaint. *N.J.S.A.* 54:5–97.1.

er's interest is subordinate to the property owner's right of redemption. *N.J.S.A.* 54:5–54; *Varsolona, supra,* 180 *N.J.* at 617, 853 *A.*2d 865 (quoting *Savage v. Weissman,* 355 *N.J.Super.* 429, 436, 810 *A.*2d 1077 (App.Div.2002)). Additionally, the Tax Sale Law places no restrictions on how a third-party investor arranges for the purchase of property and the redemption of a tax certificate in the pre-foreclosure complaint stage. *N.J.S.A.* 54:5–54; *see Cherokee Equities v. Garaventa,* 382 *N.J.Super.* 201, 209, 887 *A.*2d 1203 (Ch.Div.2005), *appeal dismissed per stipulation,* 186 *N.J.* 598, 897 *A.*2d 1055 (2006). A property owner may finance the redemption from any source and sell his interest for any amount to any person.

After the filing of the foreclosure complaint, however, both the property's sale and the redemption procedure are subject to court supervision, primarily to protect property owners from exploitation by third-party investors. *N.J.S.A.* 54:5–89.1, –98; *see Cherokee Equities, supra,* 382 *N.J.Super.* at 209, 887 *A.*2d 1203. The Act recognizes that a property owner who has not redeemed a tax certificate by the time a foreclosure action has commenced is likely in desperate financial circumstances and therefore vulnerable to the manipulation of overbearing speculators. To facilitate judicial review of the adequacy of the consideration offered to the owner, the Act requires that third-party investors who seek either directly or indirectly to acquire the property and redeem the tax sale certificate intervene in the foreclosure action. *See Simon v. Rando,* 374 *N.J.Super.* 147, 154, 863 *A.*2d 1078 (App.Div.2005), *aff'd,* 189 *N.J.* 339, 915 *A.*2d 509, 2007 *WL* 208515 (2007).

In the post-foreclosure complaint period, two separate provisions of the Tax Sale Law mandate intervention by a third-party investor before seeking redemption of a tax certificate. First, *N.J.S.A.* 54:5–98 provides that "[a]fter the [foreclosure] complaint has been filed redemption shall be made *in that cause only,* provided notice of the suit has been filed in the office of the tax collector." (Emphasis added). Requiring that a post-complaint redemption occur "in that cause only" under *N.J.S.A.* 54:5–98

strongly implies that a person seeking to redeem a tax certificate must be either a party to the action or a person intervening in the action.

Second, interrelated components of *N.J.S.A.* 54:5–89.1 buttress that conclusion. One component states that a person not a party to the foreclosure action who has an unrecorded property interest—such as a conveyance, mortgage, assignment, lien, or other type of instrument—that could have been recorded "at the time of the filing of the complaint" is bound by the results of the proceedings, unless that party both records the interest and "appl[ies] to be made a party to such action." *N.J.S.A.* 54:5–89.1.[8] That component does not permit a person with an unrecorded interest at the time of the filing of the foreclosure action to redeem a tax certificate. From a practical viewpoint, the statute's requirements give the tax collector the necessary means of knowing who is entitled to redeem.

The other component, the product of a 1967 amendment to *N.J.S.A.* 54:5–89.1, provides:

*No person, however, shall be admitted as a party to such action,* nor shall he have the right to redeem the lands from the tax sale *whenever it shall appear that he has acquired such interest in the lands for a nominal consideration* after the filing of the complaint, except where such transferee is related by blood or marriage to, or who, because of other close or personal relationship with the transferor, would in

---

[8] The first part of *N.J.S.A.* 54:5–89.1 reads:

In any action to foreclose the right of redemption in any property sold for unpaid taxes or other municipal liens, all persons claiming an interest in or an encumbrance or lien upon such property, by or through any conveyance, mortgage, assignment, lien or any instrument which, by any provision of law, could be recorded, registered, entered or filed in any public office in this State, and which shall not be so recorded, registered, entered or filed at the time of the filing of the complaint in such action shall be bound by the proceedings in the action so far as such property is concerned, in the same manner as if he had been made a party to and appeared in such action, and the judgment therein had been made against him as one of the defendants therein; but such person, upon causing such conveyance, mortgage, assignment, lien, claim or other instrument to be recorded, registered, entered or filed as provided by law, may apply to be made a party to such action.

normal course be a party to an instrument for little or no consideration, or where such party acquired his interest at a judicial sale.

[(emphasis added).]

Because *N.J.S.A.* 54:5–89.1 prohibits a third-party investor from becoming "a party to [the foreclosure] action" and redeeming a tax certificate if he acquires an interest for only "a nominal consideration," it necessarily follows that he must be a party to the action if he pays more than nominal consideration.[9] Accordingly, to become a party, the third-party investor must intervene in the action and establish to the satisfaction of the court that the owner has been offered more than "a nominal consideration" for his interest.

Taken together, *N.J.S.A.* 54:5–98 and –89.1 require judicial scrutiny of a third-party investor after the foreclosure complaint's filing. Plaintiffs cannot point to anywhere in the text of the Tax Sale Law that specifically bars a third-party investor from intervening in the foreclosure action when more than nominal consideration is offered for the property.[10] Instead, plaintiffs argue that this Court's decisions in *Bron* and *Wattles* forbid Cherrystone's intermeddling activities as a violation of the social policy that animates the Tax Sale Law. On that basis, they ask this Court to prohibit Cherrystone and its ilk from frustrating their efforts to foreclose on tax certificates. We therefore turn to *Bron* and *Wattles* to see how they bear on the issues before us.

---

[9] A family member, or close friend of the property owner, or a person who has acquired a property interest at a judicial sale is not subject to the nominal consideration requirement of *N.J.S.A.* 54:5–89.1, and, for purposes of this opinion, is not considered to be a third-party investor.

[10] Although *N.J.S.A.* 54:5–85 provides that the Tax Sale Law is to "be liberally construed as remedial legislation to encourage the barring of the right of redemption by actions in the Superior Court to the end that marketable titles may thereby be secured," that provision does not negate the specific textual provisions of the Act that protect property owners from forfeiting their homes. *See Wilson v. Unsatisfied Claim and Judgment Fund Bd.*, 109 *N.J.* 271, 278, 536 *A.*2d 752 (1988) ("In general, when there is a conflict between general and specific provisions of a statute, the specific provisions will control.").

## B.

In *Bron v. Weintraub, supra,* Woodbridge Township foreclosed on a tax sale certificate and years later conveyed the foreclosed property to a developer, who built and sold ten homes. 42 *N.J.* at 88–89, 199 *A.*2d 625. Nineteen years after the foreclosure action, the Township learned that it had failed to give notice to Harry Weintraub, who possessed an interest in the property on which the ten homes had been constructed. *Id.* at 89, 199 *A.*2d 625. To foreclose that interest, the Township then filed an action, which set a date for Weintraub's heirs "to redeem or be barred." *Ibid.* "At the eleventh hour," third-party investors Hudson Trading Corporation and Frank Altomare (collectively Hudson) forwarded a "palpably deceptive" letter to the heirs, who lived in California, and offered to purchase their interests in the Woodbridge property for a " 'courtesy consideration' " of $50. *Id.* at 89–91, 199 *A.*2d 625. The heirs apparently had been unaware of their legacy. *See id.* at 90, 199 *A.*2d 625. Ultimately, Hudson paid the heirs $400 for their property rights, which by then were worth nearly $20,000. *Id.* at 89, 199 *A.*2d 625. Hudson then presumably redeemed the tax amount due. As a result of a suit to quiet title, the trial court ruled that the Woodbridge homeowners had to pay Hudson more than $22,000 (value of the land plus profits) to purchase the property on which their houses stood. *Ibid.* The Appellate Division affirmed, and this Court then reversed. *Id.* at 89, 96, 199 *A.*2d 625.

With those egregious facts as a backdrop, this Court observed that the policy of the Tax Sale Law is "to aid municipalities in raising revenue," *id.* at 91, 199 *A.*2d 625, and "to support tax titles, a policy which overall is burdened by [Hudson's] conduct." *Id.* at 95, 199 *A.*2d 625. The Court recognized the indisputable "right of the holders of existing interests to convey them to third persons if they wish" under legitimate circumstances. *Ibid.* The Court, however, could not reconcile the goals of the Tax Sale Law with "so-called 'heir-hunting' " by speculators like Hudson, who offered

a pittance of the property's true value to the heirs and yet upset a title conveyed many years earlier after a tax sale foreclosure, albeit a defective one. *Ibid.* In weighing the equities—the manifest harm caused to the innocent homeowners compared to the lack of "social value or contribution in [Hudson's] activities"— the Court concluded that Hudson had acquired title under unconscionable circumstances. *Id.* at 95–96, 199 *A.*2d 625. Consequently, the Court voided Hudson's transaction and imposed a constructive trust on the property, allowing the homeowners to acquire the land from the Weintraub heirs for $400 plus interest. *Id.* at 96, 199 *A.*2d 625.

Following *Bron,* the Legislature amended *N.J.S.A.* 54:5–89.1, adding the language that barred a third-party investor from "redeem[ing] the lands from the tax sale whenever it shall appear that he has acquired such interest in the lands for a nominal consideration after the filing of [the foreclosure] complaint." That statutory amendment forbids the very type of predatory overreaching that is illustrated in *Bron.*

This Court had its first opportunity to apply the nominal-consideration requirement of *N.J.S.A.* 54:5–89.1 in *Wattles v. Plotts.* In that case, Wattles instituted a foreclosure action on a tax sale certificate, naming the last recorded property owner, Edward Plotts, and his heirs, described as "Unknown Owners." *Wattles, supra,* 120 *N.J.* at 447, 577 *A.*2d 131. National Asset Recovery (National) learned of the foreclosure action through a published notice in a newspaper and aggressively searched for the heirs using census data, probate records, and other documents. *Ibid.* When National found the heirs, they knew nothing about the property or their ownership rights. *Ibid.* By letter, National offered to advance to the heirs the money needed to redeem the tax certificate and to split the profits from the property's sale. *Ibid.* The heirs accepted those terms, agreeing to reimburse National for the cost of redemption and expenses related to the property's sale, and then to divide the profits fifty-fifty. *Id.* at

447–48, 577 *A*.2d 131.[11] The appraised value of the property was $162,000. *Id.* at 452, 577 *A*.2d 131.

In the foreclosure action, the trial court entered judgment in favor of the Plotts heirs, permitting them to redeem. *Id.* at 449, 577 *A*.2d 131. The Appellate Division affirmed, despite National's contractual interest in the property and its failure to intervene in the action pursuant to *N.J.S.A.* 54:5–89.1. *Id.* at 449–50, 577 *A*.2d 131.

This Court reversed, voiding National's right to profit from the transaction on the ground that, like the heir hunter in *Bron,* National had "insinuated itself into the scene for the sole purpose of furthering its own pecuniary interests." *Id.* at 453, 577 *A*.2d 131; *see also O & Y Old Bridge Dev. v. Continental Searchers,* 120 *N.J.* 454, 458, 577 *A*.2d 137 (1990). In fashioning a remedy to protect the heirs' property interests, the Court imposed a constructive trust, keeping their contract with National intact but directing Wattles, the tax certificate holder, to "succeed to National's rights." *Wattles, supra,* 120 *N.J.* at 453–54, 577 *A*.2d 131. Therefore, the heirs retained "their right to fifty per cent of the profits after expenses." *Ibid.*

In ruling against National, the Court echoed the broad public policy themes sounded in *Bron,* condemning intermeddling by speculators who glean information from foreclosure complaints in search of acquiring the property interests of heirs. *Id.* at 446, 453, 577 *A*.2d 131. *Bron's* facts, however, are far different from those in *Wattles. Bron* dealt with a third-party investor's deceptive practices and exploitation of heirs, who were offered a paltry sum for their property interest. On its face, the amendment to *N.J.S.A.* 54:5–89.1 addressed the chief evil presented in *Bron* by requiring that, after the filing of a foreclosure complaint and before redemption of a tax certificate, a third-party investor

---

[11] The tax sale certificate was redeemed for $12,376.42. *Wattles v. Plotts,* 230 *N.J.Super.* 254, 259–60, 553 *A*.2d 365 (App.Div.1989), *rev'd,* 120 *N.J.* 444, 577 *A*.2d 131 (1990).

intervene in the foreclosure proceedings and establish to the satisfaction of a court that more than nominal consideration was paid for the subject property.

*Wattles*, however, suggested that the odious terms "intermeddler" and "heir hunter" might apply to all third-party investors, even when substantial value is given to the homeowner, thus disqualifying such investors from transactions seemingly permitted by *N.J.S.A.* 54:5–89.1. In reaching that conclusion, the Court relied heavily on a Senate Statement that accompanied the bill, which was later enacted into law as an amendment to *N.J.S.A.* 54:5–89.1. *Wattles, supra,* 120 *N.J.* at 452, 577 *A.*2d 131. The Court acknowledged that "[t]he words of the statute do not reach as far as the legislative statement." *Ibid.*

Although the Senate Statement spoke disparagingly about the intrusion of intermeddlers in the tax foreclosure process, that Statement nevertheless reveals that the principal concern in amending *N.J.S.A.* 54:5–89.1 related to preventing the unscrupulous practice of investors' purchasing the interests of financially-strapped property owners for "nominal consideration." In that light, the Legislature was responding to the very activities condemned in *Bron.* The Senate Statement, in pertinent part, related that third-party investors, "armed" with information about foreclosure proceedings

examine the dockets ... to ascertain the names and addresses of the defendants in the cause from whom they then indiscriminately solicit conveyances of title, or other interests in the lands under foreclosure, *always for a nominal consideration, usually $25.00 or $50.00, which they characterize as a "courtesy consideration" in dealing with those they solicit.*

\* \* \* \*

The scheme of these intermeddlers is simple. They permit the purchaser of the tax sale certificate to invest his capital; hold the lien for the statutory period, engage counsel to examine the title, make inquiry as to the whereabouts of the defendants, their heirs, devisees, and personal representatives, prosecute the case up to the point of completion, and upon being satisfied at that time that the defendants do not intend to redeem, *such intermeddlers offer the defendants a nominal sum for a deed and they thereupon step into the shoes of the purchaser of the lien.* At that stage they find the defendants very amenable to any suggestion

> that they might make because they have nothing to lose—the defendants have already determined to abandon their interests.
>
> [*Statement Accompanying Sen. No. 291, L.* 1967, c. 149 (emphasis added).]

We find that the legislative history of the amendment to *N.J.S.A.* 54:5–89.1 can be read consistently with the statute's wording. The actual language of the enactment ordinarily is the "best indicator" of legislative intent. *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005). In interpreting legislation, "[w]e ascribe to the statutory words their ordinary meaning and significance." *Ibid.* (citing *Lane v. Holderman,* 23 *N.J.* 304, 313, 129 *A.*2d 8 (1957)). In doing so, if the legislation's purpose is clearly stated, we need look no further. *Ibid.* We will not turn to extrinsic evidence, such as a Senate Statement, in search of legislative intent unless an ambiguity arises from the statute's wording, or a straight-forward reading of the statute will lead to an absurd result, or the plain language is fatally at odds with the overall statutory scheme. *Id.* at 492–93, 874 *A.*2d 1039.

Although we find no ambiguity in the plain language of *N.J.S.A.* 54:5–89.1, we also note that the legislative history does not contradict the statute's words. We reject plaintiffs' invitation to export some of the more expansive language from *Bron* and *Wattles* to bar all third-party investors from coming to the aid of helpless property owners facing foreclosure. Like most cases, *Bron* and *Wattles* are anchored to their facts. In *Bron,* the third-party investors forwarded deceptive letters to distant heirs who had interests in property foreclosed decades earlier. The heirs received for their interests only one-fiftieth of the property's true value, and as such, no party benefited but the third-party investor. In that sense, the Court condemned "third persons who seek only to further their own interests rather than the interests already on hand." *Bron, supra,* 42 *N.J.* at 95, 199 *A.*2d 625. Passage of the amendment to *N.J.S.A.* 54:5–89.1 ensured that third-party investors would have to appear before a court and offer more than nominal consideration. In contrast to *Bron,* in the present cases, Cherrystone arguably offered substantial consideration, and thus a significant benefit to actual property owners—not heirs—facing foreclosure.

*Wattles* is more difficult to distinguish because there the heirs *seemingly* were offered substantial consideration—a fifty-fifty division of profits from the property's sale after reimbursement to National for the costs of redemption and other "out-of-pocket expenses." However, we do not know the amount of National's "out-of-pocket expenses" because National did not seek to "be admitted as a party to [the foreclosure] action." [12] Without the judicial oversight contemplated by *N.J.S.A.* 54:5–98 and 54:5–89.1, there was no determination whether National's "expenses" might devour the profits from the property's sale, leaving the heirs only nominal consideration. For that simple reason, National's failure to intervene and establish that it would pay the heirs more than nominal consideration would have been reason alone to nullify its contract and impose a constructive trust—the result reached by this Court.

To the extent that *Wattles* suggests a violation of public policy when a third-party investor offers more than nominal consideration for the property interest of an owner facing foreclosure, we now reject that view. In enacting *N.J.S.A.* 54:5–89.1, the Legislature intended to extend judicial scrutiny to financial arrangements between third-party investors and property owners during the post-foreclosure complaint period. The purpose of *N.J.S.A.* 54:5–89.1 is not to bar third-party investors from helping property owners in desperate need of financial assistance, but rather to ensure that the third-party investors do not exploit vulnerable owners by offering only nominal consideration for their property interests.

## C.

Furthermore, we do not find that Cherrystone, in general, violated a social policy embodied in the Tax Sale Law. Cherry-

---

[12] Neither this Court's decision nor the Appellate Division in *Wattles* identifies the amount of those "out-of-pocket expenses."

stone learned of the foreclosure on the tax certificates by examining public records and obtained the names of the property owners by reviewing plaintiffs' foreclosure complaints. Cherrystone then communicated with the owners and proposed an agreement that would earn it a handsome profit while at the same time rescuing for the owners a substantial portion of their equity in the encumbered properties. The Tax Sale Law does not prohibit Cherrystone's investment activities, which ultimately inure to the benefit of the property owners.

Notably, in the post-foreclosure complaint period, a family member or close friend can purchase a property interest for nominal consideration and finance the redemption of the tax certificate. *N.J.S.A.* 54:5–89.1. Likewise, to redeem the tax certificate, a property owner might obtain a bank loan in exchange for a mortgage. Accordingly, plaintiffs' dispute is not about the property owners' right to finance redemption of the tax certificate, but rather with the owners' purported right to have third-party investors—their competitors—as the financiers. The heart of the dispute for plaintiffs is the third-party investor's interference with their inchoate right to gain a fee simple title to the property.

In that regard, it bears mentioning again that plaintiff tax certificate holders are commercial investors themselves, who are guaranteed twelve percent and fifteen percent interest if redemption occurs in their respective cases. Plaintiffs knew or should have known from the start that most tax certificate investments end not in windfall profits from foreclosure but rather in high yield interest returns upon redemption.[13] *See Cherokee Equities, supra,* 382 *N.J.Super.* at 210, 887 *A.*2d 1203 ("The purchase of a tax sale certificate is not the equivalent of the purchase of the underlying title, there is no guarantee that a foreclosure will ultimately result in the acquisition of title."). Plaintiffs, moreover, controlled their own fates. Before filing the foreclosure com-

---

[13] Plaintiff Simon concedes that the redemption of tax certificates, rather than foreclosure, is the norm.

plaints, plaintiffs could have beat Cherrystone to the punch and offered to purchase title to the property directly from the owners.[14] Instead, plaintiffs, at their own peril, chanced that they could acquire the property through foreclosure without any further financial commitment. *See Dvorkin v. Twp. of Dover,* 29 *N.J.* 303, 324, 148 *A.2d* 793 (1959) (Jacob, J., dissenting) ("The common law gave full recognition to the concept that purchasers of tax sale certificates are speculators who generally seek large profits upon small investments and who may fairly be treated as acting at their peril. . . .").

We are presented with commercial competitors, one claiming to advance society's interest in collecting taxes from tax-dormant properties and the other claiming to champion the right of owners to freely sell their properties. These sophisticated investors are clearly capable of looking after their own interests. *See Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.,* 182 *N.J.* 210, 230, 864 *A.2d* 387 (2005) ("We are not eager to impose a set of morals on the marketplace. Ordinarily, we are content to let experienced commercial parties fend for themselves. . . ."). In pursuing their self-interests to maximize their profits, the parties make possible the achievement of socially desirable objectives. Provided the parties comply with the dictates of the Tax Sale Law and other relevant laws, this Court is loath to intervene in the self-regulating forces of the marketplace, particularly when competition will result in protecting a property owner's interest from forfeiture.

Viewing the motives of the parties in the most objective light, plaintiff Simon sought to gain title to the Ross property, valued at $1,200,000, based on an approximately $50,000 investment over a

---

[14] The current statutory structure does not provide for judicial review of the adequacy of consideration given in a pre-complaint offer. *See N.J.S.A.* 54:5–89.1. We recognize that there is the same potential for abuse as in the post-complaint venue. Without saying more, tax sale certificate owners and other commercial investors should beware of engaging in unconscionable practices in obtaining possession of property from an owner in distressed circumstances. *See N.J.S.A.* 56:8–2.

five-year period, whereas Cherrystone sought to do the same based on a $250,000 investment over several months. Likewise, plaintiff Grivas hoped to acquire title to the Smyth property, valued at between $325,000 and $350,000, based on an approximately $100,000 investment extending over a six-year period, whereas Cherrystone hoped to do the same based on a $200,000 to $225,000 investment over several months.

In the end, risk-averse tax certificate holders can preempt third-party investors, like Cherrystone, by offering to purchase the owner's interest. We have no reason to believe that the overall marketability of tax sale certificates will be lessened by this holding, which simply articulates the rights accorded by the Legislature to both tax certificate holders and property owners.

In sum, we acknowledge that the primary goal of the Tax Sale Law is to encourage the sale of tax certificates. *N.J.S.A.* 54:5–85. Nonetheless, we do not read the plain language of *N.J.S.A.* 54:5–89.1 to prohibit a third-party investor, who intervenes timely in a foreclosure action, from purchasing the property owner's interest for more than nominal consideration and redeeming the tax certificate. Under those circumstances, the owner is endowed with the statutory right to sell the property. Accordingly, we do not reach the question of defendants' claimed property rights arising under the Federal and State Constitutions. *See New Jersey Div. of Youth v. S.S.,* 187 *N.J.* 556, 564, 902 *A.2d* 215 (2006) (noting that courts should not address constitutional questions unless necessary to disposition of case).[15]

### III.

We still must decide whether, in fact, Cherrystone offered more than nominal consideration for the Ross and Smyth properties.

---

[15] Although we do not address the constitutional question, we note generally "that the right to acquire, own and dispose of real property is within the protective scope of the Fourteenth Amendment, [and] that such right is recognized by Article 1, [P]aragraph 1, of our State Constitution." *Jones v. Haridor Realty Corp.,* 37 *N.J.* 384, 391, 181 *A.2d* 481 (1962).

To answer that question, we first must determine the meaning of "nominal consideration" in the context of *N.J.S.A.* 54:5–89.1. That statute bars a person from intervening as a party in a foreclosure action or "redeem[ing] the lands from the tax sale whenever it shall appear that he has acquired such interest in the lands for *a nominal consideration* after the filing of the [foreclosure] complaint." *N.J.S.A.* 54:5–89.1 (emphasis added).

To understand what is intended by those words, we again turn to the standard canons of statutory construction. If in ascribing to those words their "ordinary meaning and significance," the Legislators' intent is self-evident, we need not search further for guidance. *DiProspero, supra,* 183 *N.J.* at 492, 874 *A.*2d 1039. Admittedly, the term "nominal consideration" is not self-revelatory. Because that term came to life in a statute that was enacted in response to the abuses illustrated in *Bron,* legislative history may shed light on its meaning within the framework of the Tax Sale Law.

As usual, we begin with the words themselves. In legal parlance, "nominal consideration" is defined as consideration that "bear[s] no relation to the real value of the contract or article, as where a parcel of land is described in a deed as being sold for 'one dollar,' no actual consideration passing, or the real consideration being concealed." *Black's Law Dictionary* 278 (5th ed. 1979). In common usage, the term nominal is identified with such synonyms as "small," or "trifling." *Webster's II New College Dictionary* 742 (2001).

Those definitions are in some measure reinforced by the Senate Statement that accompanied the bill amending *N.J.S.A.* 54:5–89.1. In large part, the bill responded to the facts in *Bron* in which third-party investors offered the heirs only one-fiftieth of the value of the property subject to foreclosure. In condemning the practice of eleventh-hour intermeddling in the tax sale foreclosure process, the Statement specified that the intermeddlers "indiscriminately solicit conveyances of title, or other interests in the lands under foreclosure, always for a nominal consideration, usual-

ly $25.00 or $50.00, which they characterize as a 'courtesy consideration' in dealing with those they solicit." *Statement Accompanying Sen. No. 291, L.* 1967, *c.* 149. In highlighting concern over the exploitation of property owners, the Senate Statement further noted that

> *intermeddlers offer the defendants a nominal sum for a deed* and they thereupon step into the shoes of the purchaser of the lien. At that stage they find the defendants very amenable to any suggestion that they might make because they have nothing to lose—the defendants have already determined to abandon their interests.
>
> [*Ibid.* (emphasis added).]

In view of the standard dictionary definitions and legislative history of *N.J.S.A.* 54:5–89.1, nominal consideration suggests an offer that is insubstantial. We still, of course, must determine precisely what more than nominal consideration is in a particular case.

In addressing that issue, our courts have looked at several different formulas for determining whether consideration is more than nominal. One such formula is the so-called economic realities test—the test that plaintiffs urge we adopt. Under that test, nominal consideration is roughly the equivalent of fair market value. *See Savage, supra,* 355 *N.J.Super.* at 439, 810 *A.*2d 1077; *see also In re Celeryvale Transp. Inc.,* 44 *B.R.* 1007, 1014 (Bankr. E.D.Tenn.1984), *aff'd,* 822 *F.*2d 16 (6th Cir.1987). Thus, plaintiffs propose that if a third-party investor offered a property owner less than the full value of the property, the offer should be declared invalid. Under that formulation, for the purpose of redeeming the tax certificate, the property owner might not be permitted to accept an offer for eighty percent of the property's value, and instead would suffer a complete forfeiture. We cannot construe the plain language and history of the Tax Sale Law to lead to that absurd result.

We also reject the so-called percentages test, which defines nominal consideration as any amount less than twenty-five percent of the market value of the property interest. *See Savage, supra,* 355 *N.J.Super.* at 439, 810 *A.*2d 1077. Under that formulation, if

the third-party investor offered the property owner $240,000 on property assessed at $1,000,000, the offer would be automatically void, and again the property owner would receive nothing. No New Jersey court has adopted either of the two mechanistic tests described above.

Nor do we find the windfall profits test, followed by one appellate panel, to be in keeping with either the plain meaning of nominal consideration or the historical context in which that term appears in *N.J.S.A.* 54:5–89.1. *See Corestates/N.J. Nat'l Bank v. Charles Schaefer Sons, Inc.,* 386 *N.J.Super.* 554, 564–65, 902 *A.*2d 309 (App.Div.2006). Under that test, the third-party investor's gain, not the property owner's, is the focal point. Accordingly, a property owner receives nominal consideration whenever a third-party investor obtains a "disproportionate gain after the fair market value of the property, as set by an arm's length sale or appraisal, is reduced by any legitimate expenses in redeeming the property." *Ibid.* Given that approach, a transaction that yielded $250,000 for the property owner and a $600,000 "windfall" for the third-party investor on property valued at $1,000,000 might be declared unenforceable, resulting in a tax foreclosure and total loss for the owner. The panel's formulation allows the tax certificate holder to receive a super windfall, and the owner to suffer forfeiture of all equity in his property.

We disagree with the *Corestates* panel, which held that "[t]he objective of the tax sale law is to prevent a windfall to the intermeddler." *Id.* at 565, 902 *A.*2d 309. The purpose of *N.J.S.A.* 54:5–89.1 is to protect the financially vulnerable property owner from acceding to an unconscionable offer. It is to ensure that the property owner receives some true value—more than nominal consideration—for his property interest. Surely, in the example just given, to state the obvious, the property owner is exceedingly better off with $250,000 than nothing at all.

In keeping with the statute's purpose, we adopt a more flexible, under-all-the-circumstances approach that will keep the focus on the benefit to the property owner facing forfeiture of his

land. Strict mathematical equations cannot address the varying circumstances that may bear on a fair determination of the issue. The court *may* consider a number of factors, including but not limited to the amount received by the owner in comparison to the property's fair market value and to his equity in the property. The court also may give some weight to a windfall profit to be made by the third-party. A court should rightly be reluctant to strike-down a third-party financing arrangement that will provide some meaningful monetary relief to the property owner. In the end, more than nominal consideration under *N.J.S.A.* 54:5–89.1 means consideration that is not insubstantial under all the circumstances; it is an amount, given the nature of the transaction, that is not unconscionable.

In *Simon,* the owner received $250,000 for property appraised at approximately $1,200,000. After deducting from the purchase price the $56,000 redemption cost and amounts paid to cover a judgment and other tax arrears, the property owner was left, in hand, with $63,422.77. In *Grivas,* the owner received $200,000 for property appraised at between $325,000 and $350,000. After deducting from the purchase price the redemption amount of $99,294.42 and other expenses, the property owner was left, in hand, with $90,623.48.

On its face, without a detailed analysis, it appears that the trial court was correct in finding that the consideration in both *Simon* and *Grivas* was more than nominal. For the reasons that follow, we need not say more on the subject.

### IV.

Last, we must resolve whether Cherrystone complied with the procedural requirements of the Tax Sale Law and our court rules in redeeming the tax sale certificates in the present cases. *N.J.S.A.* 54:5–89.1, –98; *R.* 4:64–6(b). Both the applicable statutes and court rule clearly require that after the filing of a foreclosure action, a person seeking to redeem a tax certificate must be a party to that action.

*N.J.S.A.* 54:5–98 provides that *"[a]fter the complaint has been filed redemption shall be made in that cause only,* provided notice of the suit has been filed in the office of the tax collector." (emphasis added); *see also R.* 4:64–6(b) ("In [tax sale certificate foreclosure] actions redemption shall be made in the action only, provided notice of the action has been filed in the tax collector's office."). In the post-foreclosure complaint stage, the requirement that a person, directly or indirectly, seeking to redeem a tax certificate "be admitted as a party to such action" permits judicial oversight of the adequacy of consideration offered for the property interest. *N.J.S.A.* 54:5–89.1; *see Rando, supra,* 374 *N.J.Super.* at 155, 863 *A.2d* 1078.

By forbidding an interested investor, who is not a party to the foreclosure action from "indirectly" seeking redemption, we intend to interdict the myriad machinations that a creative mind might devise to elude the Tax Sale Law. For example, a third-party investor who does not intervene in the action, but who enters into a contract to purchase the subject property, fronts the funds necessary to redeem a tax certificate, and schedules the closing for after the redemption date violates *N.J.S.A.* 54:5–89.1. Because the investor upon entering into a contractual arrangement has an equitable interest in the property, he must intervene in the foreclosure action to allow a judicial determination that more than nominal consideration was paid for the property. *See Feighner v. Sauter,* 259 *N.J.Super.* 583, 592, 614 *A.2d* 1071 (App.Div.1992) (noting that "upon execution of contract of sale, an equitable transfer occurs").

When a person attempts to redeem a tax certificate, the tax collector need only look to the foreclosure complaint for the names of persons with an interest in the property. Any person not named in the complaint must move to intervene in the action. Without the court's approval, that person is not entitled to redeem the tax certificate. *See Rando, supra,* 374 *N.J.Super.* at 157, 863 *A.2d* 1078 ("[O]ne who acquires an interest post-complaint and is not named in the court's order of redemption is barred from

redeeming through the tax collector."). On the other hand, if the third-party investor properly intervenes and satisfies the court that more than nominal consideration has been offered for the property interest, then the court can issue an order making the investor a party to the foreclosure action. With that order and appropriate notice to the tax collector, the intervenor can then redeem the tax certificate.

Cherrystone argues that requiring intervention in the post-complaint stage will cause third-party investors to incur significant litigation costs that will be passed along to property owners, thus depreciating the value of their equity. The mandate that third-party investors seeking to redeem tax certificates intervene in foreclosure actions, however, follows from *N.J.S.A.* 54:5–89.1 and – 98. As noted, those statutes protect a vulnerable property owner from exploitation by ensuring that more than nominal consideration is offered for his interest. It bears mentioning again that a property owner has, at a minimum, two years to redeem a tax certificate before a foreclosure action can be instituted.[16] By delaying redemption until after the filing of a foreclosure action, the property owner must accept responsibility for the costs that will be incurred. Our function is to effectuate the will of the Legislature, not to pass on the wisdom or efficiency of the Tax Sale Law. We have no separate tax policy.

■ Accordingly, before redeeming or causing to be redeemed the tax certificate, Cherrystone had the duty to apply for admission to the foreclosure actions. Cherrystone did not have a right to tender funds to the tax collector without prior judicial authorization. Cherrystone's failure to follow the clear dictates of the Tax Sale Law and our court rules renders any redemption or attempted redemption invalid.

---

[16] When the certificate holder is the municipality there is only a six-month grace period before foreclosure proceedings may commence. *N.J.S.A.* 54:5–86.

██ Because it did not seek to become a party to the actions before arranging for the redemption of the tax certificates in *Simon* and *Grivas,* Cherrystone will not be permitted to benefit from the purchase of the Ross and Smyth properties. But neither will we permit the property owners to suffer as a result of Cherrystone's procedural defaults. Accordingly, we conclude that the appropriate remedy is to impose constructive trusts on Cherrystone's rights under its contracts with the property owners. The certificate holders will be allowed to succeed to Cherrystone's rights, after reimbursing Cherrystone for any monies expended redeeming the tax certificates and for the purchase price of the properties. In the event the certificate holders decline to do so, the constructive trusts will be vacated and the contractual rights will revert back to Cherrystone.

## V.

In conclusion, we hold that after the filing of a tax sale foreclosure action, a third-party investor who acquires a property interest subject to the action must intervene to establish that he has offered more than nominal consideration for the interest. With the court's approval, the investor then may redeem or assist in the redemption of the tax certificate. Without leave of court, the investor has no right to participate, directly or indirectly, in the redemption process.

In the cases before us, during the post-foreclosure complaint period, Cherrystone contracted to purchase defendants' properties and arranged for the redemption of the tax certificates without prior court approval. We will not permit Cherrystone to profit from transactions that violate the Tax Sale Law. As an equitable remedy, we will impose constructive trusts in favor of defendant property owners, granting plaintiffs the opportunity to assume Cherrystone's contractual rights. If plaintiffs choose not to do so, the contractual rights will revert back to Cherrystone. We therefore reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

*For reversal and remandment*—Justices LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—5.

*Opposed*—None.